

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-5-1994

# O'Neill v. City of Philadelphia

Precedential or Non-Precedential:

Docket 93-1378

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation
"O'Neill v. City of Philadelphia" (1994). *1994 Decisions.* Paper 105.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/105

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

----------

No. 93-1378

----------

JOHN O'NEILL;
SAMUEL R. GOODMAN, on behalf
of themselves and all others similarly situated

v.

CITY OF PHILADELPHIA;
PHILADELPHIA PARKING AUTHORITY;
OFFICE OF THE DIRECTOR OF FINANCE;
BUREAU OF ADMINISTRATIVE OFFICE OF ADJUDICATION

City of Philadelphia, Office of The Director of
Finance and Bureau of Administrative Adjudication,

<u>Appellants</u>

----------

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 91-06759)

----------

Argued October 28, 1993

BEFORE:  ROTH, LEWIS and GARTH, <u>Circuit</u> <u>Judges</u>

----------

(Opinion filed August 5, 1994)

----------

Judith E. Harris
Michael F. Eichert (Argued)
Office of City Solicitor
1600 Arch Street, 8th Floor

Philadelphia, Pennsylvania  19103-1628

Attorneys for Appellants City of
Philadelphia, Office of The Director
of Finance, Bureau of Administrative
Administrative Office of Adjudication

Andrew F. Mimnaugh
1420 Locust Street
Suite 15-N
Philadelphia, Pennsylvania  19102

Vincent J. Ziccardi (Argued)
1435 South Broad Street
Philadelphia, PA  19147

Attorneys for Appellees
John O'Neill and Samuel R. Goodman

----------

OPINION OF THE COURT

----------


GARTH, Circuit Judge:

This appeal requires us to determine whether the federal courts must entertain a constitutional challenge to the City of Philadelphia's parking ticket procedures -- procedures that resulted in the imposition of a $45 fine against plaintiff-appellee John O'Neill, which remains unpaid, and a $173 fine against plaintiff-appellee Samuel Goodman, which was paid.  We hold that the district court should have exercised its discretion to abstain, rather than to decide the constitutionality of Philadelphia's ticketing procedures.  Thus, we will vacate the district court's judgment and remand with instructions that the district court dismiss the plaintiffs' complaint.

2

I

John O'Neill ("O'Neill") and Samuel Goodman ("Goodman") brought suit in federal district court against the City of Philadelphia, the Philadelphia Parking Authority, the Office of the Director of Finance, and the Bureau of Administrative Office of Adjudication (collectively, the "City"), alleging that the City's reorganization of its system for adjudicating parking tickets violated their constitutional rights, and the constitutional rights of similarly situated plaintiffs.  On March 29, 1993, the district court granted summary judgment in favor of the plaintiffs on their due process claim, vacating the City's $45 fine against O'Neill, and entering judgment in the amount of $173 in favor of Goodman.  O'Neill v. City of Philadelphia, 817 F. Supp. 558 (E.D. Pa. 1993).

Although the district court declined the City's invitation to abstain from exercising jurisdiction over this action, id at 562 n.8, and despite the City's failure to protest the district court's abstention determination on appeal, we asked the parties to submit supplemental briefs addressing the question of whether the district court properly should have abstained from entertaining the plaintiffs' claims under the abstention doctrine announced by the Supreme Court in Younger v. Harris, 401 U.S. 37 (1971), and its progeny.[0]

_____

[0]     Even though the question of Younger abstention was not raised by the parties on appeal, we may consider it sua sponte.

3

We conclude that the district court abused its discretion in refusing to abstain under Younger and in reaching the merits of O'Neill and Goodman's due process claim.

## II

### A.

Prior to June 1, 1989, the "Traffic Court of Philadelphia" had original jurisdiction to adjudicate parking violations committed in the City of Philadelphia. 42 Pa. Cons.

---

Bellotti v. Baird, 428 U.S. 132, 143-44 n.10 (1976); McLaughlin v. Pernsley, 876 F.2d 308, 314 n.5 (3d Cir. 1989); Blake v. Kline, 612 F.2d 718, 727 (3d Cir. 1979). Cf. Winston v. Children and Youth Servs., 948 F.2d 1380, 1384-85 (3d Cir. 1991) (declining to address question of abstention where defendants failed to preserve the issue for appellate review). But see id. at 1396-98 (Garth, J., dissenting) (citing cases holding that failure to file a cross appeal did not preclude Court of Appeals' consideration of particular issues).

In addition, we note somewhat surprisingly that we are not the first federal Court of Appeals to focus on the Younger problems that arise when parking tickets are challenged in § 1983 actions. In a case similar to the one before us on appeal, the Seventh Circuit decided that Younger abstention was appropriate where the federal claimant had initiated a federal action instead of contesting his numerous parking violations in the available state forum. Jacobson v. Village of Northbrook Mun. Corp., 824 F.2d 567 (7th Cir. 1987). See also Horn v. City of Chicago, 860 F.2d 700, 702 n.5 (7th Cir. 1988) (reversing district court's holding that parking ticket demand notices issued by the City of Chicago violated the plaintiffs' due process rights and seriously questioning district court's conclusion that Younger abstention was not appropriate); Ballard v. Wilson, 856 F.2d 1568 (5th Cir. 1988) (holding that Younger precluded consideration of claims for injunctive and declaratory relief while state criminal prosecutions were pending against Ballard on his thirty-six violations of the City of Houston's overtime parking ordinance); Friedman v. Beame, 558 F.2d 1107 (2d Cir. 1977) (recognizing, but refusing to decide, Younger issue in action challenging City of New York's parking regulations).

4

Stat. Ann. §§ 1302 and 1321.  Appeals from the traffic court's decisions were heard by the Pennsylvania Court of Common Pleas.

In 1989, the Philadelphia City Council reorganized the City's system for adjudicating parking tickets by enacting an ordinance which authorized the Office of the Director of Finance to assume control over the regulation and disposition of parking violations in the City of Philadelphia.  12 Phila. City Code § 12-2802(1).  Under the new framework, a parking ticket is affixed to the vehicle, id. § 12-2804(3), and the owner of the ticketed vehicle is sent a notice by first class mail.  Id. § 12-2805(1).  The person to whom the ticket is issued has fifteen days to answer it, either admitting the violation by payment of the fines, costs, and fees, admitting with explanation, or denying liability and requesting a hearing.  Id. § 12-2806(1).  A failure to answer or to pay the fine will result in a Bureau of Administrative Adjudication ("BAA")[0] hearing examiner's entering an order by default sustaining the charges, fixing the appropriate fine, and assessing appropriate costs and fees.  Id. § 12-2807(3).

When the violation is contested, and a hearing is requested, a BAA hearing examiner holds a hearing and determines whether the charges have been established.  Id. § 12-2807.  Once the hearing examiner has entered his decision, the violator has

---

[0]      Regulations adopted by the Director of Finance created the Bureau of Administrative Adjudication for the purpose of exercising the duties and powers enumerated in chapter 12-2800 of the Philadelphia City Code, the chapter added by the 1989 ordinance.

thirty days to file an appeal to the BAA Parking Appeals Panel. Id. § 12-2808. The BAA's decision, or a default by the ticket holder, creates a debt owed to the City. Id. § 12-2808(5). The decision of the Parking Appeals Panel can be appealed to the Pennsylvania Court of Common Pleas, and through the state judicial system. 2 Pa. Cons. Stat. Ann. § 752.[0]

The effect of the 1989 reorganization was to change the nature of parking violations from summary offenses, which were criminal in nature, to civil violations. In practice, a defendant before the traffic court was entitled to three rights not available at a BAA hearing: (1) a disposition could not be made without the personal appearance of the defendant, (2) the defendant's guilt had to be proved beyond a reasonable doubt, and (3) the two-year statute of limitations for summary offenses was in effect.[0]

Finally, the new ordinance created a period of dual jurisdiction during which a person who had received a parking ticket, citation, or traffic court summons between October 2,

---

[0]    Section 752 provides as follows: "Any person aggrieved by an adjudication of a local agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42 (relating to judiciary and judicial procedure)."

[0]    O'Neill and Goodman argue that they were unconstitutionally deprived of rights which were only available in traffic court. We know of no constitutional right, however, to a hearing before a tribunal of one's own choosing, see Crane v. Hahlo, 258 U.S. 142, 147 (1928); Sill v. Pennsylvania State University, 462 F.2d 463, 469 (3d Cir. 1972), or to assert a defense based upon a given statute of limitations. See Chase Securities Corp. v. Donaldson, 325 U.S. 304 (1945).

6

1987 and May 31, 1989, could choose to proceed either in traffic court or before the BAA.  12 Phila. City Code § 12-2807(8).


B.


O'Neill and Goodman had received parking tickets both before and after the effective date of the 1989 ordinance.[0] Neither paid their fines.  Neither responded to the summons and periodic payment-notices which were sent to them.  In particular, neither answered "Violation Warning Notice[s]" sent in November 1989 by the Office of the Director of Finance explaining that they could elect to appear before the traffic court or the BAA for the purpose of contesting their outstanding tickets.  Nor did they respond to "Order[s] of Default" informing them that their failure to pay the fines could result in the City's taking further legal action which might have an adverse effect on their property rights.[0]

---

[0]      The plaintiffs' claims relate only to the retrospective application of the reorganized adjudicatory procedures to the parking tickets they received prior to June 1, 1989.  The tickets which fall into this category were issued on the following dates:

| Goodman | O'Neill |
|---|---|
| May 16, 1989 | May 1, 1989 |
| December 7, 1988 | October 10, 1988 |
| December 11, 1987 | November 28, 1987 |
| December 11, 1987 | |
| February 26, 1987 | |

[0]      While we need not reach the merits of the plaintiffs' constitutional claim, we note that at least one other Court of Appeals has held that individuals who have received, but purposefully ignored, timely and repeated notices alerting them of their right to a hearing at which they could contest parking violations, are in no position to argue that those notices deprived them of due process.  See Saukstelis v. City of Chicago, 932 F.2d 1171 (7th Cir. 1991) (holding car owner who ignored ten

On March 4, 1991, Goodman requested a hearing before the BAA to contest a ticket he had received on February 4, 1991. The hearing examiner held such a hearing on March 18, 1991, at which it assumed jurisdiction over the February 4 ticket, and nine additional tickets for which Goodman was responsible. Five of the tickets dated from before June 1, 1989. Five dated from after June 1, 1989.

Goodman objected that the BAA lacked jurisdiction to determine his liability on the pre-June 1, 1989 tickets, and that, in any event, he had the right to raise the statute of limitations as a defense in the BAA proceeding. The hearing examiner overruled Goodman's objections and assessed total fines of $173.00 for the pre-June 1, 1989 tickets, and $74.10 for the post-June 1, 1989 tickets. Goodman paid his fines.[0]

In April 1991, O'Neill attempted to list for disposition with the traffic court three pre-June 1, 1989 parking tickets. The traffic court informed him that it no longer heard parking violation cases. O'Neill then requested a hearing with the BAA at which he raised the same objections as Goodman. On August 30, 1991, the BAA hearing examiner rejected O'Neill's

tickets, follow-up notices, and 21-day warning of eligibility for booting, could not insist that city violated his due process rights by putting "Denver Boot" on his car). Saukstelis had been denied a preliminary injunction, giving rise to the appeal. Despite that posture of the case, the Seventh Circuit remanded with instructions "to enter judgment for the City without further ado." Id. at 1174.

[0] Even though Goodman has paid his fines, a possible refund of those fines constitutes a collateral consequence sufficient to prevent mootness. Elkin v. Fauver, 969 F.2d 48, 53-54 n.4 (3d Cir. 1992); Nakell v. Attorney Gen., 15 F.3d 319, 322 (4th Cir. 1994).

objections but reduced his liability for the outstanding parking tickets to $45.00.  O'Neill has not paid his fine.

On October 30, 1991, O'Neill and Goodman filed a five-count complaint (later amended) against the City of Philadelphia, pursuant to 42 U.S.C. § 1983, alleging that the City had violated their constitutional and state-law rights by denying them a hearing before the traffic court with respect to the parking tickets they had received prior to June 1, 1989.[0]  On October 15, 1992, the district court denied the plaintiffs' motion for class certification but agreed to consider the action as a test case for persons similarly situated.  The case was submitted on cross motions for summary judgment.[0]

---

[0]     Count One alleged that the City had violated the plaintiffs' due process rights by denying them the rights which had been available in traffic court.
     Count Two alleged that the City had violated the plaintiffs' due process rights, and the Ex Post Facto clause of the United States Constitution, by failing to obtain the plaintiffs' consent to its jurisdiction, as required by the City ordinance, and by applying the laws and regulations governing hearings under the 1989 ordinance, and not those of the traffic court.
     Count Three alleged that the City exceeded the authority granted under Pennsylvania law by unlawfully extending the BAA's subject matter jurisdiction.
     Count Four alleged that the BAA violated the U.S. and Pennsylvania Constitutions by holding hearings on parking violations that were time barred under Pennsylvania law.
     Count Five alleged § 12-2807(4) is an unconstitutional Bill of Attainder to the extent it subjects the plaintiffs' vehicles to seizure without a hearing.

[0]     The City argues that the district court lacked jurisdiction to hear the plaintiffs' claims.  In particular, the City argues that because the plaintiffs did not appeal the hearing examiner's determination to the Parking Appeals Panel, under 12 Phila. City Code § 12-2808(5), the Finance Director's Office had not reached a final decision as to the plaintiffs' liability, and that, therefore, the plaintiffs' federal suit was premature.  We disagree.  Section 12-2808(5) explicitly provides

9

On March 29, 1993, the district court granted the City's motion for summary judgment as to four of the five constitutional claims alleged in the plaintiffs' complaint.[0] With respect to the remaining count ("Count Two"), however, the district court held that the City's failure to allow the plaintiffs to challenge their pre-June 1, 1989 tickets in traffic court, as opposed to the BAA, violated the plaintiffs' due process rights. Consequently, the district court entered judgment in favor of Goodman in the amount of $173.00, and directed the City to vacate its outstanding $45.00 judgment against O'Neill.

The district court also ordered the parties to submit memoranda as to the appropriate terms of relief, and procedure to be adopted by the BAA, with respect to the 2,713,975 persons similarly situated to O'Neill and Goodman (i.e., persons who had undisposed of parking violation summonses issued before June 1, 1989). Recognizing the potentially heavy financial burden such relief might place on the City's resources, the district court stayed this latter portion of its order pending appeal.

_____

that "in the event that no appeal is taken [to the Parking Appeals Panel], the order of the Parking Hearing Examiner shall be the final order [of the Finance Director's Office]."

[0] The plaintiffs-appellees have not appealed the district court's grant of summary judgment against them on the constitutional claims alleged in Counts One, Four, and Five, nor its grant of summary judgment with respect to the ex post facto allegations in Count Two. Because the plaintiffs did not press for summary judgment on the state claims alleged in Counts Three and Four of their complaint, the district court deemed them to have been withdrawn without prejudice. The district court's judgment is found in its entirety at O'Neill v. City of Philadelphia, 817 F. Supp. at 570-71 (E.D. Pa. 1993).

10

We have jurisdiction over the City's appeal from the partial grant of summary judgment in favor of O'Neill and Goodman pursuant to 28 U.S.C. § 1291.

### III

The abstention doctrine first announced by the Supreme Court in Younger v. Harris, 401 U.S. 37 (1971), in the context of a pending state criminal prosecution, has since been extended to non-criminal state civil proceedings, Huffman v. Pursue, Ltd., 420 U.S. 592 (1975), and state administrative proceedings, Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, (1982), in which important state interests are implicated, so long as the federal claimant has an opportunity to raise any constitutional claims before the administrative agency or in state-court judicial review of the agency's determination. Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 629 (1986).

In Middlesex, the Supreme Court delineated three requirements which must be satisfied before a federal court may abstain from hearing a case over which it has jurisdiction: (1) there must be pending or ongoing state proceedings which are judicial in nature; (2) the state proceedings must implicate important state interests; and (3) the state proceedings must afford an adequate opportunity to raise any constitutional

issues. 457 U.S. at 432; <u>Olde Discount Corp. v. Tupman</u>, 1 F.3d 202, 211 (3d Cir. 1993).[0]

A.

"We exercise plenary review over the legal determinations of whether the requirements for abstention have been met. [Citations omitted.] Once we determine that the requirements have been met, we review a district court's decision to abstain under <u>Younger</u> abstention principles for abuse of discretion." <u>Gwynedd Properties, Inc. v. Lower Gwynedd Township</u>, 970 F.2d 1195, 1199 (3d Cir. 1992).

1.

We need not belabor the question of whether a BAA proceeding is "judicial in nature." Clearly, it is. <u>See</u> <u>Williams v. Red Bank Bd. of Ed.</u>, 662 F.2d 1008, 1020-21 (3d Cir. 1981).[0] The more compelling issue is whether, in the present

---

[0] Even if these three elements are satisfied, abstention is not appropriate where the federal claimant makes a showing of bad faith, harassment, or some other extraordinary circumstance. <u>Middlesex</u>, 457 U.S. at 435. We note that, in the present case, no such extraordinary circumstances exist.

[0] Under 12 Phila. City Code § 12-2807, hearings must be conducted "in a fair and appropriate manner." The defendant may call witnesses, supplement testimony by affidavits, and interpose legal arguments. While the technical rules of evidence do not apply, "all relevant evidence of reasonably probative value may be received." Testimony must be given under oath. A record of the proceeding must be made. The hearing examiner is authorized to conduct extensive fact-finding and to compel the production of any document, paper, or record relevant to the violation charged. He must issue his decision based on the evidence and arguments offered.

12

case, there is a "pending" state proceeding inasmuch as O'Neill and Goodman filed their federal lawsuit in lieu of appealing the hearing examiner's determination, and in lieu of raising their constitutional claims in the state forum.

It is a well-settled that, "[f]or Younger purposes, the State's trial-and-appeals process is treated as a unitary system, and for a federal court to disrupt its integrity by intervening in midprocess would demonstrate a lack of respect for the State as sovereign." New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 369 (1989) ("NOPSI"). Thus, "a necessary concomitant of Younger is that a party [wishing to contest in federal court the judgment of a state judicial tribunal] must exhaust his state appellate remedies before seeking relief in the District Court." Id., quoting Huffman v. Pursue, Ltd., 420 U.S. 592, 608 (1975).

---

Under 12 Phila. City Code § 12-2808(2), the Parking Appeals Panel:

> shall have the power to review the facts and the law, and shall have power to affirm the determination or to reverse or modify any determination appealed from for error of fact or law, or to remand for additional proceedings, or, in appropriate cases, to hear the matter de novo.

See, e.g., Middlesex, 457 U.S. at 423 (holding state bar disciplinary proceedings judicial in nature where local attorney ethics committees act as an arm of the state supreme court in performing the function of receiving and investigating complaints and holding hearings). But see New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 369-73 (1989) (holding ratemaking proceeding not judicial in nature because the setting of future utility rates essentially is a legislative act).

13

In contrast to Huffman, where the federal claimant had failed to appeal a state trial court judgment against it, here, O'Neill and Goodman have failed to seek state-court judicial review of an order entered in a state administrative proceeding. We are faced, then, with the question left unanswered by the Supreme Court in NOPSI: whether a state proceeding is "pending," and Younger abstention proper, where the adjudicatory process has become final as a result of the federal claimant's failure to pursue state-court judicial review of an unfavorable state administrative determination? 491 U.S. at 369 & n.4 (1989).

The Courts of Appeals have furnished contradictory answers to this question. Compare Thomas v. Texas State Bd. of Med. Exam., 807 F.2d 453, 456 (5th Cir. 1987) (holding "mere availability of state judicial review of state administrative proceedings does not amount to the pendency of state judicial proceedings within the meaning of Younger") with Alleghany Corp. v. Pomeroy, 898 F.2d 1314 (8th Cir. 1990) (holding district court should have abstained where Alleghany had filed action in federal court instead of appealing state administrative decision to North Dakota state courts).

We have been given no reason why a litigant in a state administrative proceeding should be permitted to forego state-court judicial review of the agency's decision in order to apply for relief in federal court. Rather, we find the grounds offered by the Supreme Court to support its holding in Huffman -- that state appellate review of a state court judgment must be exhausted before federal court intervention is permitted -- are

14

equally persuasive when considered with respect to state-court judicial review of a state administrative determination.[0]

First, federal intervention before a state court has had the opportunity to review an agency's decision is no less an "aspersion on the capabilities and good-faith of state appellate courts," and no "less a disruption of the State's efforts to protect interests which it deems important," 420 U.S. at 608, than the federal intervention with the state judicial appellate process explicitly condemned in <u>Huffman</u>.  Second, federal

---

[0]    We find no inconsistency between our holding and the principle that administrative remedies need not be exhausted prior to bringing a § 1983 action in federal court.  <u>Patsy v. Florida Bd. of Regents</u>, 457 U.S. 496 (1982).  As the Supreme Court stated in <u>Dayton Christian Schools</u>:

> The application of <u>Younger</u> principles to pending state administrative proceedings is fully consistent with <u>Patsy</u> . . . , which holds that litigants need not exhaust their administrative remedies prior to bringing a § 1983 suit in federal court.  <u>Cf.</u> <u>Huffman v. Pursue, Ltd.</u>, 420 U.S. 592, 607-11 (1975).  Unlike <u>Patsy</u>, the administrative proceedings here are coercive rather than remedial, began before any substantial advancement in the federal action took place, and involve an important state interest.

477 U.S. at 627-28 n.2.  The critical distinction between <u>Dayton Christian Schools</u> and <u>Patsy</u> is that <u>Patsy</u> involved a <u>remedial</u> action brought by the plaintiff to vindicate a wrong which had been inflicted by the State.  In contrast, <u>Dayton Christian Schools</u> involved an administrative proceedings initiated by the State, before a state forum, to enforce a violation of state law. That is, in <u>Dayton Christian Schools</u>, the action taken by the Ohio Civil Rights Commission was <u>coercive</u> rather than remedial, just as the action taken by the City of Philadelphia, to enforce its traffic tickets against O'Neill and Goodman, was coercive action which the plaintiffs sought to circumvent by filing their complaint in federal court.

15

intervention which would annul the results of an agency determination would deprive "the States of a function which quite legitimately is left to them," i.e., the disposition of constitutional issues which arise in litigation over which they have jurisdiction. Id. at 609.

The requirement that litigants pursue state-court judicial review of state administrative decisions serves two additional purposes, identified by the Eighth Circuit in Pomeroy, which go to the very heart of the "comity" concerns upon which Younger abstention is grounded: (1) "the state courts may construe state law in a way which renders a constitutional decision unnecessary," id. 898 F.2d at 1317, citing Penzoil Co. v. Texaco, Inc., 481 U.S. 1 (1987) (stating that an "important reason for abstention is to avoid unwarranted determination of federal constitutional questions"), and (2) "interests of comity are advanced, and friction reduced, if the courts of a state, rather than the federal courts, determine that the United States Constitution requires the state to alter its practices." Pomeroy, 898 F.2d at 1318.

We therefore hold that state proceedings remain "pending," within the meaning of Younger abstention, in cases such as the one before us, where a coercive administrative proceeding has been initiated by the State in a state forum, where adequate state-court judicial review of the administrative determination is available to the federal claimants, and where the claimants have chosen not to pursue their state-court

16

judicial remedies, but have instead sought to invalidate the State's judgment by filing a federal action.

2.

The second prong of the Middlesex test is whether the proceedings at issue implicate an important state interest. This factor goes to the very core of the raison d'etre of Younger abstention inasmuch as the Supreme Court's holding in Younger rested primarily on considerations of "comity," a concept which encompasses "a proper respect for state functions." 401 U.S. at 44.

Accordingly, "when we inquire into the substantiality of the State's interest in its proceedings we do not look narrowly to its interest in the outcome of the particular case -- which could arguably be offset by a substantial federal interest in the opposite outcome. Rather, what we look to is the importance of the generic proceedings to the State." NOPSI, 491 U.S. at 364-65.

It would well nigh be impossible to overstate the point that the federal courts have no interest whatsoever in the underlying subject matter of this litigation -- the City of Philadelphia's on-street parking regulations. In contrast, the City of Philadelphia has a vital and critical interest in the functioning of a regulatory system, such as the one at issue here, which is intimately associated with the physical and financial workings of the city in general, and of the municipal government in particular.

17

Prior Supreme Court decisions have held that the states have a substantial interest in enforcing criminal laws that bear a close relationship to criminal proceedings, Huffman, 420 U.S. at 604, in regulating attorney conduct, Middlesex, 457 U.S. at 434, in administering child custody proceedings, Moore v. Sims, 442 U.S. 415 (1979), in preventing sex discrimination against employees, Dayton Christian Schools, 477 U.S. at 628, and in regulating intrastate utility rates. NOPSI, 491 U.S. at 365.[0]

We do not believe that we exaggerate the scope of these decisions in holding that the City of Philadelphia has a significant and substantial interest in the regulation of on-street parking, and in the vindication of the system it has implemented to adjudicate violations of those regulations.[0] The

[0] We have held that the states have a substantial interest in education, Williams v. Red Bank Bd. of Ed., 662 F.2d at 1017-18 (3d Cir. 1981) (noting that state's interest in education is not weakened by the fact that, technically, local school boards press disciplinary charges against teachers, and not the State), and in regulating securities transactions. Olde Discount Corp. v. Tupman, 1 F.3d at 212 (3d Cir. 1993). See also Mission Oaks Mobile Home Park v. City of Hollister, 989 F.2d 359, 361 (9th Cir. 1993) (finding important state interest in regulating mobile home parks even though rental rates are regulated by local ordinance rather than statewide law); Federal Express Corp. v. Tennessee Pub. Serv. Comm'n, 925 F.2d 962, 969 (6th Cir. 1991) (affirming district court's finding important state interest in regulating intrastate trucking).

[0] The Supreme Court has recognized that "[t]he importance of the state interest may be demonstrated by the fact that the noncriminal proceedings has a close relationship to proceedings criminal in nature." Middlesex, 457 U.S. at 432. Until May 31, 1989, of course, parking infractions in the City of Philadelphia were criminal offenses. Simply because parking violations are the least threatening of all motor vehicle violations -- and are now civil offenses in the City of Philadelphia -- does not mean that the State's overriding interest in enforcing its motor vehicle laws, many of which remain criminal in nature, has had its importance diluted.

plaintiffs, in fact, have conceded as much in their supplemental brief.  See Appellee's Supp. Br. at 1 ("This case involves the regulation and administration of on-street parking which, of course, is an important interest to the State of Pennsylvania and the City of Philadelphia.").

## 3.

The third prong of our inquiry is whether the claimant is afforded an adequate opportunity to raise his constitutional claims in the state forum.  The Supreme Court has held that this third element is satisfied in the context of a state administrative proceeding when the federal claimant can assert his constitutional claims during state-court judicial review of the administrative determination.  Dayton Christian Schools, 477 U.S. at 629; Middlesex, 457 U.S. at 436.  Moreover, "when a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary."  Penzoil Co. v. Texaco, Inc., 481 U.S. at 15.

In the present case, neither O'Neill nor Goodman attempted to raise his federal claims in the state proceedings. Accordingly, we would be well-justified in assuming that, had they done so, they would have been afforded an adequate remedy.[0]

---

[0]    In Williams v. Red Bank Bd. of Ed., 662 F.2d 1008 (3d Cir. 1981), we held that a federal claimant is afforded an opportunity to assert her constitutional claims in the state forum where an administrative board is authorized to dismiss the

19

In any event, it is undisputed that O'Neill and Goodman could have raised their constitutional arguments before the administrative review board, again in the state-court appellate process, to and through the Pennsylvania Supreme Court, and, ultimately, before the United States Supreme Court.  See 28 U.S.C. § 1257(a).[0]

B.

In sum, we hold that the three-prong test for Younger abstention is satisfied in the present case.  The BAA proceeding was a judicial proceeding which may be deemed "pending" as a result of O'Neill's and Goodman's failure to take advantage of the appellate remedies which were available to them.  The implementation of Philadelphia's procedures for adjudicating parking tickets implicates important state (and not federal)

---

charges against the claimant.  In this respect, we note that the BAA Parking Appeals Panel is authorized "to review the facts and the law, and shall have the power to affirm the [hearing examiner's] determination or to reverse or modify any determination appealed from for error of fact or law, or to remand for additional proceedings, or, in appropriate cases, to hear the matter de novo."  12 Phila. City Code § 12-2808(2).

[0]        28 U.S.C. § 1257 provides in relevant part as follows:

        (a) Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari where . . . the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution . . . .

20

interests.  Lastly, O'Neill and Goodman could have asserted their constitutional claims in the state proceedings.

Anxious though we may be "to vindicate and protect federal rights and federal interests," Younger, 401 U.S. at 44, considerations of comity demand that we remain sensitive to the legitimate interests of the states.  Since this case does not involve any of the extraordinary circumstances which would otherwise make abstention inappropriate, we hold that the district court abused its discretion in failing to abstain from hearing O'Neill and Goodman's federal claims in deference to the overwhelming interest of the City of Philadelphia and the State of Pennsylvania with respect to their on-street parking regulations.

IV

Therefore, we will vacate the district court's judgment of March 29, 1993, and remand this case to the district court with instructions to abstain under Younger v. Harris, and to dismiss the plaintiffs' complaint.

Costs will be taxed against O'Neill and Goodman.

21

John O'Neill, et al. v. City of Philadelphia, et al.
No. 93-1378


LEWIS, Circuit Judge, dissenting.

Chief Justice Marshall may well have overstated his point when, writing for the Court in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821), he stated: "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution." Marshall's absolutist view of the federal courts' duty to exercise the jurisdiction Congress and the Constitution afford them is frequently quoted, but of course, it has not been faithfully followed.[0] Abstention decisions, among others, demonstrate that federal courts can and do decline to hear cases that they have the constitutional and statutory authority to decide. But see New Orleans Pub. Serv., Inc. v. New Orleans, 491 U.S. 350, 358 (1989) ("NOPSI") (stating that "federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred", and describing

---

[0]    Professor Shapiro has pointed out that the circumstances of Cohens, a case requiring Marshall to assert and defend the Supreme Court's authority to review state court decisions, might account for the "frightening" tenor and content of his pronouncement. David L. Shapiro, "Jurisdiction and Discretion," 60 N.Y.U. L. Rev. 543, 543-44 (1985). He suggests as well that on at least one other occasion, in Mason v. Ship Blaireau, 6 U.S. (2 Cranch) 240, 264 (1804), Marshall seemed to recognize that federal courts did retain a degree of discretion not to exercise jurisdiction that undoubtedly existed. Id. at 545 n.12 and accompanying text.

22

abstention cases as merely restricting the availability and timing of certain forms of relief).  Nonetheless, the ideal behind Marshall's statement in Cohens remains a meaningful one; even the decisions disproving its accuracy recognize and come to terms with the significant degree of truth to its directive.  In Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976), for example, where the Supreme Court concluded that federal jurisdiction should not be exercised, it cautioned that abstention "represents an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it."  Id. at 813 (quoting County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188–89 (1959)).  This "obligation of the federal courts to exercise the jurisdiction given them," the Court later emphasized, is "virtually unflagging."  Id. at 817; see also NOPSI, 491 U.S. at 359 (same); Deakins v. Monaghan, 484 U.S. 193, 203 (1988) (same).  Thus, as we recently reiterated, "[a]bstention is the exception and not the rule."  Marks v. Stinson, 19 F.3d 873, 881 (3d Cir. 1994); see also NOPSI, 491 U.S. at 359 (same); Colorado River, 424 U.S. at 813 (same).  "Abdication of the obligation to decide cases can be justified under this doctrine only in exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest."  Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Comm'n, 791 F.2d 1111, 1114 (3d Cir. 1986) (quoting County of Allegheny, 360 U.S. at 188–89).

In light of these well-established principles, I believe that the majority's expansion of the <u>Younger</u> abstention doctrine is clearly unwarranted. This area of the law is no place for inflexible absolutes. (With all due respect to Chief Justice Marshall, not even he could convince me that my colleagues in the majority have committed treason to the Constitution.) But at the very least, a federal court's reasons for abdicating its responsibility to decide cases over which it has jurisdiction should be quite strong. In my view, the reasons supporting the majority's decision that abstention is mandated here are not nearly adequate.

I.

The plaintiff-appellees, John O'Neill and Samuel Goodman, initiated proceedings in Philadelphia's (the City) Bureau of Administrative Adjudication (BAA) to challenge several parking tickets they had received. In response to Goodman's and O'Neill's requests, the BAA scheduled hearings to review their tickets. In addition, however, the BAA decided that at the same time, it would adjudicate a group of older tickets that the plaintiffs had received prior to June, 1989. When the plaintiffs discovered this, they objected that the BAA did not have the authority to make rulings on the older tickets. The BAA hearing examiners who presided over their cases rejected these arguments.[0]

---

[0] The BAA does not, and legally cannot, initiate hearings to review parking tickets. As I discuss below, it is not a court of record. It has no authority to issue a summons or a warrant, nor can it enter a civil

24

The City concedes and in fact relies on the point that in deciding to adjudicate Goodman's and O'Neill's older (pre-June, 1989) parking tickets, the BAA hearing examiners plainly failed to follow the local ordinance setting forth the agency's powers and procedures. See Phila. City Code § 2800 et seq. A provision of that ordinance states that if a person elects to contest a parking ticket he received prior to the date the ordinance became effective, he must consent to the BAA's jurisdiction to adjudicate that ticket. Phila. City Code

judgment. App. at 404-05. The majority describes the administrative proceedings that occurred here as "coercive" action taken by the City. Maj. Op. at 15-16 n.13. In my view, that is not correct. The only conceivably coercive, proactive conduct the BAA took in this case was directly prohibited by local ordinance.

The facts of Ohio Civil Rights Comm'n v. Dayton Christian Schools, 477 U.S. 619 (1986), which the majority views as describing "coercive" state-initiated action similar to that which occurred here, are notably different. In Dayton Christian Schools, a state agency acting within its lawful authority initiated an administrative action against a private school by filing a complaint. Id. at 624. While those administrative proceedings were pending, the school filed a § 1983 suit in federal district court. Here, in contrast, Goodman and O'Neill initiated the administrative process by requesting a hearing. The BAA did not and could not require them to do so. It is legally incapable of coercing participation by unwilling individuals. The agency did act independently and contrary to the plaintiffs' wishes when it assumed jurisdiction over their older tickets. As the City points out, however, that action was flatly prohibited by local ordinance. The City thus describes the state action challenged here as an unfortunate and legally indefensible (but not unconstitutional) mistake. In deciding to adjudicate Goodman's and O'Neill's older tickets, therefore, the BAA hearing officers were acting contrary to the state's interests and instructions; they were not acting in furtherance of the state's valid goals. I discuss the legal significance of these facts below. For now, I only mean to set them straight.

25

§ 2807(8). The ordinance went into effect on June 1, 1989. The plaintiffs did not consent to and, in fact, expressly challenged the BAA's jurisdiction to adjudicate their older tickets. Thus, the BAA hearing examiners acted contrary to law in addressing the infractions that Goodman and O'Neill had been charged with committing prior to June, 1989.

The fact that the hearing examiners overlooked the clear requirements of an applicable provision of the City Code is understandable. Their job is to fairly and efficiently dispose of challenges to parking tickets, a task that generally does not require any extensive legal training or research. While the record does not provide a comprehensive description of the educational and professional backgrounds of BAA hearing examiners, I think we can safely assume that they are not attorneys. Dominic Ceremeli -- who, as a Deputy Director of Finance in charge of BAA operations, supervises the hearing examiners, acts as an instructor during their training, and presides over hearings himself when needed -- testified during his deposition that he is a high school graduate, has some college education but no degree, and has not attended law school. Presumably, at least as a general matter, the hearing examiners serving under Ceremeli do not possess more advanced legal credentials.

And given the job that hearing examiners do, they should not need much specialized training in the law. The examiners are not expected to evaluate complex legal arguments. They determine what happened and decide whether that conduct

constituted a parking violation.  Accordingly, in the chapter of the Parking Hearing Examiner Manual that covers defenses that ticket recipients might raise, the subject of federal statutory or constitutional rights never comes up.  Instead, the examiners learn, for example, that a "Going to the Bathroom" defense should not succeed; after all, the Manual correctly explains, "This is a risk all drivers take."  App. at 213.[0]  I do not mean to trivialize the important and often difficult work that the BAA and its hearing examiners do in adjudicating challenges to parking tickets.  It is clear, however, that nobody in or outside City government has ever believed that the people who preside over this administrative process would possess either the inclination or ability to evaluate the kind of claims that arise under the federal civil rights statutes.  Quite simply, that is not the BAA's job.  See BAA "Mission Statement", App. at 174 (describing the BAA's purpose and goals, which include fairness and efficiency but not the protection of federal rights).

Goodman and O'Neill could have initiated an administrative appeal before the Parking Appeals Panel within thirty days of the date on which the hearing officers entered final determinations in their cases.  They did not do so. Rather,

---

[0]    The tone and content of the Manual further supports my belief that the BAA hearing examiners are not attorneys.  Otherwise, the Manual would not need to inform its readers that "[t]he legal system over hundreds of years has developed very complicated rules of evidence."  App. at 187.  Nor, presumably, would it contain advice like: "It is important that you listen carefully and pay attention"; or, "In addition to paying attention, it is important that a Hearing Examiner does not lose his temper."  App. at 184.

more than seven months after Goodman's hearing and two months after O'Neill's, they filed this § 1983 suit in federal district court, claiming, among other things, that by adjudicating their older tickets, the City had deprived them of property without due process of law in violation of their Fourteenth Amendment rights. Significantly, then, when Goodman and O'Neill initiated their suit in federal court, the state administrative process was over. Nothing was pending before the BAA, and any effort the plaintiffs might have made to return there to revive and pursue their administrative proceedings would have been rejected as time-barred. See City's Supp. Br. at 3 (stating that the plaintiffs have foregone their opportunity for appellate review, and that "[i]t is therefore no longer possible for the federal court to retain jurisdiction while awaiting the outcome of a state proceeding . . . ."). Thus, there has not been, and there could not have been, ongoing legal activity at the state level since prior to the time Goodman and O'Neill brought this case.

The district court agreed with the plaintiffs that the City had deprived them of their due process rights and entered summary judgment in their favor. The City has appealed that decision.

II.

Like the majority, I recognize that the abstention question this case presents is an open one. The Supreme Court has not provided an answer, and the courts of appeals have reached conflicting results. Compare Allegheny Corp. v. Pomeroy, 898 F.2d 1314 (8th Cir. 1990) (agreeing with the majority) with

28

_Thomas v. Texas State Board of Medical Examiners_, 807 F.2d 453 (5th Cir. 1987) (agreeing with me). The majority concludes that the district court abused its discretion by failing to abstain under _Younger v. Harris_, 401 U.S. 37 (1971), and the cases following and extending _Younger_'s rationale. I disagree.

## A.

In _Younger_, _supra_, the Supreme Court held that absent extraordinary circumstances, federal courts should abstain from enjoining ongoing state criminal prosecutions. The decision rested on several grounds. The first was the "basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." _Younger_, 401 U.S. at 43-44. Clearly, this principle has no relevance here. Goodman and O'Neill have never been subject to anything resembling a criminal prosecution. Additionally, there is no ongoing state proceeding to enjoin. And lastly, because the plaintiffs cannot return to the BAA administrative process, they have no means of seeking adequate relief for their alleged constitutional injury through alternative legal avenues.

However, as the Court has recognized in extending _Younger_ abstention beyond the context of criminal prosecutions, there is more to this doctrine than "the accepted rule that equity will not enjoin the prosecution of a crime." _Trainor v. Hernandez_, 431 U.S. 434, 441 (1977). The _Younger_ Court also "voiced a `more vital consideration,' namely, that in a union

29

where both the States and the Federal Government are sovereign entities, there are basic concerns of federalism which counsel against interference by federal courts, through injunction or otherwise, with legitimate state functions, particularly with the operation of state courts." Trainor, 431 U.S. at 441 (citation omitted). These somewhat ill-defined but significant considerations of comity and federalism are the ones on which the majority relies in reaching its conclusion. In my view, however, this case does not implicate such concerns to the extent necessary to justify a decision mandating abstention under the Younger doctrine.

The most significant and frequently cited reason federal courts have articulated for abstaining under Younger has been the importance of not interfering with state proceedings. See, e.g., Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 431 (1982) (stating that Younger and its progeny "espouse a strong policy against interference with pending state judicial proceedings"); Trainor, 431 U.S. at 445-46 (applying Younger abstention to avoid "interrupting [state] enforcement proceedings pending decision of the federal court" and the "disruption of suits by the State in its sovereign capacity"). It is important, we have repeatedly stated, to keep clear of pending state cases. E.g., Coruzzi v. New Jersey, 705 F.2d 688, 690 (1983) ("The Younger abstention doctrine rests on the strong federal policy on noninterference with pending state judicial proceedings.") For this reason, "[a] federal court may consider Younger abstention when the requested equitable relief

30

would constitute federal interference in state judicial or quasi-judicial proceedings." Marks v. Stinson, 19 F.3d at 882 (citing Middlesex County Ethics Comm., 457 U.S. at 431, and Huffman v. Pursue, Ltd., 420 U.S. 592, 599-600 (1975)). But where such interference will not occur, "the principles of comity underlying Younger abstention are not implicated." Id. (quoting Gwynedd Properties, Inc. v. Lower Gwynedd Township, 970 F.2d 1195, 1201 (3d Cir. 1992)). As the Supreme Court put it in Steffel v. Thompson, 415 U.S. 452, 462 (1974), "the relevant principles of equity, comity, and federalism `have little force in the absence of a pending state proceeding.'" In such circumstances, the Court explained, a federal court can exercise its given jurisdiction without creating duplicative legal proceedings or disrupting the state system; nor could a decision allowing the federal suit to go forward "be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles." Id.

Here, once again, there was no pending state proceeding when Goodman and O'Neill initiated their federal suit. Therefore, there was nothing with which the district court could have interfered by exercising jurisdiction over the case. Indeed, the court did exercise its jurisdiction in reaching the merits of the plaintiffs' claims, and no such interference took place. Because the BAA process was over, it could not have been disrupted. Even had the district court made a conscious and determined effort to hinder the state from pursuing its important interests or

31

demonstrating its ability to recognize and protect federal rights, it could not have done so.

"Younger does not require federal plaintiffs to exhaust their appellate remedies unless the relief being sought from the federal court involves disruption of the state's judicial process." Marks, 19 F.3d at 884 (emphasis added). No such disruption is possible here. The majority, nonetheless, concludes that abstention is not only appropriate, but that by exercising its jurisdiction, the district court committed an abuse of discretion.

The Younger doctrine is also said to serve the interests of comity and federalism by preventing federal courts from projecting any doubt that state courts can and will protect federal rights. See, e.g., Trainor, 431 U.S. at 446 (basing decision to abstain on the desire to avoid disrupting state suits "combined with the negative reflection on the State's ability to adjudicate federal claims that occurs whenever a federal court enjoins a pending state proceeding"). According to the majority, this consideration supports its conclusion that abstention is required here. It believes that by exercising jurisdiction over Goodman and O'Neill's § 1983 suit, the district court did in fact cast an "aspersion on the capabilities and good-faith" of the state system. Maj. Op. at 16 (quoting Huffman, 420 U.S. at 608). At least, the majority reasons, the insult was just as disparaging here as it would have been if the plaintiffs had commenced their federal action after losing in the Pennsylvania Court of Common Pleas. Once again, I disagree.

32

Goodman and O'Neill have alleged that the BAA examiners presiding over their administrative hearings made decisions which resulted in a violation of their Fourteenth Amendment rights. Instead of bringing an appeal before other administrative officials -- who, like the original examiners, are not attorneys and are not in the business of adjudicating § 1983 cases -- the plaintiffs went to federal court. When they did so, they had never been before a state tribunal, nor had they ever had direct access to a state tribunal, that was competent to hear their federal claims. Unlike judges in state trial courts, the officials who administer BAA proceedings (at both the hearing and appellate stages) cannot, as a practical or a legal matter, decide whether the City should be held liable for a deprivation of the plaintiffs' constitutional rights. That is a complicated question over which Article III judges have disagreed in this case. State trial courts have concurrent jurisdiction over § 1983 suits, and Pennsylvania's judges are perfectly capable of handling them. The BAA, in contrast, is not even a court. The officials presiding over its hearings and appeals are not attorneys. They do not possess either the training or the resources to adjudicate § 1983 suits. Even if those limitations did not exist, the informal, streamlined procedural rules that govern BAA proceedings would prevent agency officials from performing this challenging job adequately. Is it really such an insult to the state system to allow individuals allegedly deprived of constitutional rights at the first stage of such an administrative process to bring their § 1983 suit in federal

33

court, rather than first to proceed with an administrative appeal and then to pursue relief through the state courts?

The majority answers affirmatively. The aspersion cast by a failure to abstain here, it states, would be equal in magnitude to that cast by permitting plaintiffs to go forward with federal actions after losing in state trial court. But by not abstaining here, the district court did not displace a state court of appeals. It displaced a BAA parking appeals panel. Would we actually offend Pennsylvania by allowing § 1983 claimants to prefer a federal district court to the BAA? Would the State even defend its agency's legal or practical ability to handle such a case? Of course not. When the plaintiffs suffered their alleged constitutional injury at their BAA hearings, they had a choice: they could appeal within the agency or they could bring suit in federal court. The decision they made, in my view, does not disparage the good faith or the abilities of either BAA administrators or the state courts. And I believe that Pennsylvania would agree; the Commonwealth is not so unrealistic or over-sensitive as the majority's argument might suggest.

So, in my view, the district court neither interfered with nor insulted the state system when it exercised its jurisdiction over this case, and those principal values of comity and federalism that <u>Younger</u> abstention serves are not significantly (or, arguably, even remotely) advanced by today's decision.

The majority, however, lists several additional comity concerns. It points out that if we failed to require abstention

34

under the circumstances of this case, state courts would not be able to decide the constitutional issues that arise in disputes over which they have jurisdiction. State courts would also lose the opportunity to construe state laws in a way which would make the resolution of federal constitutional questions unnecessary. And finally, the majority reasons, it is better to let state courts determine when the state must alter its practices to conform to the requirements of the U.S. Constitution; that way, the "friction" and resentment following federal decisions announcing such a mandate can be avoided, and the interests of comity are furthered.

I agree that if district courts exercise their jurisdiction over § 1983 suits brought after administrative decisions subject to eventual state judicial review, state courts would not get the opportunity to make preliminary determinations of state and (when necessary) federal law.[0] However, if these comity concerns were sufficient to require the abdication of federal judicial responsibility to hear § 1983 cases, then we would require plaintiffs to exhaust their available state remedies before bringing such suits in federal court. Of course, under the Supreme Court's holdings in Patsy v. Florida Board of Regents, 457 U.S. 496 (1982), and Monroe v. Pape, 365 U.S. 167

---

[0] This case does not involve any difficult and unresolved issues of state law that, depending on their resolution, might affect or make unnecessary our treatment of the federal questions it presents. If it did, we might properly abstain under Railroad Comm'n v. Pullman Co., 312 U.S. 496 (1941). The majority does not suggest that Pullman abstention would be appropriate here.

(1961), that is not necessary.  Section 1983 plaintiffs may forego opportunities to seek recourse through state administrative and judicial processes and elect to bring their federal claims, in the first instance, in federal court.  When they do so, as is often the case, state courts do not get the opportunity to decide the state and federal law questions that these disputes present.  The very same comity concerns that the majority relies on here give way to the overriding federal interest in adjudicating suits alleging a violation of federally protected rights.  The additional comity concerns the majority mentions are no more persuasive here than they were in Patsy, where the Supreme Court looked past them in holding that § 1983 plaintiffs need not exhaust their administrative remedies before proceeding in federal court. See Patsy, 457 U.S. at 532–33 (Powell, J., dissenting) (defending the exhaustion requirement as promoting the principles of comity recognized in Younger and criticizing the Court's decision as forsaking such considerations).

In Marks v. Stinson, we recognized that "Younger principles must be applied in a manner consistent with [the] well-established proposition" set forth in Patsy.  Marks, 19 F.3d at 882.  Unlike the plaintiff in Patsy, however, Goodman and O'Neill had already been through one stage of the state administrative process when they commenced their suit in federal court.  The majority believes that once plaintiffs initiate BAA proceedings, they cannot be permitted to leave the state system without exhausting their appellate remedies.  I agree that Patsy

36

does not control here.  However, today's decision strikes me as more about exhaustion than abstention.  In my view, this case is far closer to Patsy than it is to Huffman v. Pursue, Ltd., 457 U.S. 592 (1975), and the other cases requiring Younger abstention.

In Huffman, supra, the sheriff and prosecuting attorney of a county in Ohio brought suit under a public nuisance statute against the owner of a theater that showed pornographic films.  Following trial, the state court ruled in Ohio's favor.  It issued a judgment ordering the theater to close for one year and authorizing the state to seize and sell property used in the theater's operation.  The next day, rather than filing an appeal, the theater owner brought suit in federal district court alleging that Ohio's application of its nuisance law was unconstitutional and asking for an injunction prohibiting the enforcement of the state trial court's judgment.

The Supreme Court held that the district court should have abstained under Younger.  In reaching that conclusion, it relied heavily on "the policy of noninterference" with cases that are pending before state courts.  Huffman, 422 U.S. at 599–605.  The theater owner had argued that after the state trial court entered its judgment, there was no ongoing proceeding to disrupt.  The Supreme Court rejected that position.  Huffman, 420 U.S. at 608 ("[A] necessary concomitant of Younger is that a party in appellee's posture must exhaust state appellate remedies before seeking relief in the District Court . . . .").  Its reasons for doing so, which are not applicable here, fully convey the

37

differences between Huffman and the case before us.  The Court

stated:

> Virtually all of the evils at which
> Younger is directed would inhere in federal
> intervention prior to completion of state
> appellate proceedings, just as surely as they
> would if such intervention occurred at or
> before trial.  Intervention at the later
> stage is if anything more duplicative, since
> an entire trial has already taken place, and
> it is also a direct aspersion on the
> capabilities and good faith of the state
> appellate courts.  Nor, in these state-
> initiated nuisance proceedings, is federal
> intervention at the appellate stage any the
> less a disruption of the State's efforts to
> protect interests which it deems important.
> Indeed, it is likely to be even more
> disruptive and offensive because the State
> has already won a nisi prius determination
> that its valid policies are being violated in
> a fashion which justifies judicial abatement.
>
> Federal post-trial intervention, in a
> fashion designed to annul the results of a
> state trial, also deprives the states of a
> function which quite legitimately is left to
> them, that of overseeing trial court
> dispositions of constitutional issues which
> arise in civil litigation over which they
> have jurisdiction.  We think this
> consideration to be of some importance
> because it is typically a judicial system's
> appellate courts which are by their nature a
> litigant's most appropriate forum for the
> resolution of constitutional contentions.

Huffman, 420 U.S. at 608-09.  Again, virtually none of those

justifications for abstention apply here.  Federal adjudication

of the plaintiffs' § 1983 claims would not be duplicative of the

BAA hearings; the hearing examiners could not and did not address

the constitutional implications of their decisions.  As I have

already explained, displacing a parking appeals panel is entirely

38

different than displacing a state appellate court, and the former does not cast any aspersion on the good faith or abilities of state institutions. Unlike Huffman, in this case the district court did not disrupt a state-initiated proceeding commenced to protect interests which the state deems important. Rather, it was Goodman and O'Neill who initiated the BAA process. (The agency, recall, is powerless to do so itself.) And the state action giving rise to the plaintiffs' constitutional claims has not been deemed important to the state but has instead been characterized as an unfortunate and unlawful mistake committed by individual administrative officials. Finally, while state appellate courts might provide the litigant's "most appropriate forum for the resolution of constitutional contentions", Id. at 609, one could hardly say the same thing about a parking appeals panel. Such a suggestion, in fact, would reflect a more insulting view of the state judiciary than any decision declining to abstain under Younger.

The majority also states that Dayton Christian Schools, supra, is more applicable here than Patsy. See Maj. Op. at 15-16 n.13. The federal plaintiff in Patsy, it reasons, initiated a remedial action to vindicate a wrong which had been inflicted by the State. Dayton Christian Schools is different, in the majority's view, because like the case before us, it involved coercive administrative proceedings initiated by the State to enforce a violation of state law. But Goodman and O'Neill's § 1983 suit is remedial -- not, as the majority suggests, purely defensive. The plaintiffs claim that the BAA hearing examiners

39

violated their due process rights in deciding to adjudicate their older tickets, and they have sought relief for that wrong in federal court. True, they could have pursued the same remedy through an administrative appeal and then through the state court system. Under the principles of Patsy, however, which I believe are applicable here, they need not have exhausted their state administrative and judicial options. Additionally, unlike the federal plaintiffs in cases like Huffman, Dayton Christian Schools, Juidice v. Vail, 430 U.S. 327 (1977), Trainor v. Hernandez, 431 U.S. 434 (1977), Moore v. Sims, 442 U.S. 415 (1979), and Middlesex County Ethics Comm., 457 U.S. 423 (1982), Goodman and O'Neill have never been targets of state-initiated legal proceedings. While the majority states that the BAA process was coercive, the fact is that the BAA cannot adjudicate tickets unless recipients request a hearing. Again, the agency does not have the legal power to initiate its own process, and it cannot coercively subject anyone to its authority. Thus, Goodman and O'Neill have not asked the district court for protection from the state's independent efforts to enforce its laws through an administrative proceeding directed against them. Rather, after allegedly suffering a constitutional injury at the hands of state officials presiding over an administrative process that the plaintiffs initiated for their own benefit, they turned to the federal district court for relief instead of pursuing administrative and then judicial appeals within the state system. In these circumstances, it requires only the smallest extension of Patsy -- as compared to a far greater and less reasonable

40

extrapolation of Huffman, Dayton Christian Schools, and other decisions requiring Younger abstention -- to permit § 1983 plaintiffs to go forward with their claims in federal court.

Our prior decision in Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Comm'n, 791 F.2d 1111 (3d Cir. 1986), supports this view. Kentucky West involved a dispute between two gas companies and the Pennsylvania Public Utilities Commission ("PUC"). The companies initiated an administrative proceeding before the PUC seeking approval of a proposed rate increase. The PUC denied their request, and the companies challenged that determination in state court. Shortly thereafter, they filed suit in federal district court seeking declaratory and injunctive relief. The federal complaint alleged that Pennsylvania's regulatory scheme and the PUC's decision were either preempted by federal statute or unconstitutional under the commerce and equal protection clauses. The district court dismissed the companies' suit under Burford and Younger abstention. We reversed, stating:

> "In the typical Younger case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin a continuation of those state proceedings." Crawley v. Hamilton County Comm'rs, 744 F.2d 28, 30 (3d Cir. 1984). In this case, on the other hand, the federal plaintiffs -- [the gas companies] -- are also the state plaintiffs. Moreover, they are not seeking to enjoin any state judicial proceeding; instead, they simply desire to litigate what is admittedly a federal question in a federal court, having agreed to dismiss their pending state appeal if the district court assumes jurisdiction over the merits of their complaint.

41

> Under the circumstances, then, we
> believe that the balance of state and federal
> interests tips decidedly away from abstention
> under Younger. . . . To deny [the gas
> companies] access to a federal forum simply
> because of their pending state appeal would
> be at odds with a fundamental premise of our
> federal judicial system: that is, "that where
> Congress has granted concurrent jurisdiction,
> a plaintiff is free to bring suit in both the
> state and federal forums for the same cause
> of action." [New Jersey Educ. Ass'n v.
> Burke, 579 F.2d 764, 769 (3d Cir. 1978).]

Kentucky West, 791 F.2d at 1117. In Marks v. Stinson, we
recently reaffirmed the principles set forth in Kentucky West in
holding that Younger abstention was not appropriate where the
exercise of federal jurisdiction would not interfere with
parallel state proceedings. Marks, 19 F.3d at 885. The
plaintiffs in this case occupy the same position as the gas
companies in Kentucky West: they have never been defendants in
state administrative or judicial proceedings; rather, after
allegedly suffering a deprivation of their federal rights as a
result of a state administrative decision, they chose to seek
relief in federal court. Indeed, the argument for abstention was
stronger in Kentucky West and Marks than it is here, as this case
does not raise real concerns of interrupting ongoing litigation
in state courts involving the same subject matter giving rise to
the federal suit. Our reasons for not abstaining previously,
therefore, seem even more compelling in this case.

The First Circuit's decision in Kercado-Melendez v.
Aponte-Roque, 829 F.2d 255 (1st Cir. 1987), also counsels against
a decision mandating abstention. The plaintiff in that case,
Kercado, worked for the Puerto Rico Department of Public

42

Instruction ("DPI") as a school district superintendent. The Secretary of the DPI charged Kercado with incompetence and improper conduct. After Kercado appeared at an informal DPI hearing at which the charges against her were addressed, she received an order dismissing her from her employment. She had the option to appeal her termination within the DPI administrative appeals process but declined to do so. Instead, Kercado filed a § 1983 suit in federal court alleging that she had been fired as a result of her political affiliations in violation of her First Amendment rights, and further that the state had deprived her of due process by failing to provide her with a pre-termination hearing. On appeal, the Secretary of the DPI argued "that because Kercado could have appealed the dismissal to the DPI Board of Appeals, the district court should have abstained and thereby forced Kercado to litigate her claims in a Puerto Rico forum." Kercado-Melendez, 829 F.2d at 259. "In effect," the court continued, the Secretary was arguing "that Kercado should not have been permitted to bring a section 1983 suit in federal court because of the availability of an appeal within the Puerto Rico administrative and judicial apparatus." Id. The majority takes precisely the same position here.

The First Circuit rejected the Secretary's argument. It explained that in Kercado-Melendez, unlike Dayton Christian Schools,

> the administrative proceeding is remedial rather than coercive. The administrative appeal process could be triggered only on Kercado's initiative if she wished to pursue her remedies within the Puerto Rico

43

> administrative framework. _Patsy_ holds that
> she was not required to do so.

_Id._ at 260 (emphasis added). The administrative process here,
like the ones in _Kercado-Melendez_ and _Patsy_ and unlike the one in
_Dayton Christian Schools_, could be triggered only on the
plaintiffs' initiative. The BAA was powerless to bring Goodman
and O'Neill before it, and it was powerless to compel them to
challenge the hearing examiners' decisions before a parking
appeals panel. Accordingly, I agree with the First Circuit's
conclusion that the principles of _Patsy_ are more applicable than
those of _Dayton Christian Schools_ or other decisions requiring
_Younger_ abstention. As _Kercado-Melendez_ explains, we should not
fail "to recognize that there is a significant difference between
a civil rights plaintiff who seeks to use the federal courts to
stop or nullify an ongoing state proceeding in which she is a
defendant, and a civil rights plaintiff who has an option to
initiate a state proceeding to remedy a constitutional wrong
perpetrated by a state actor." _Kercado-Melendez_, 829 F.2d at
261.

B.

In reaching its conclusion that _Younger_ abstention is
mandated here, the majority seeks to protect and promote
principles of comity and federalism. I do not agree with its
assessment of the harm those interests would suffer if we
permitted the district court to exercise its jurisdiction.
Additionally, although the majority barely acknowledges this
point, there are other highly significant countervailing

44

interests at stake in suits brought under § 1983 which merit serious consideration in any discussion of <u>Younger</u> abstention. The majority's analysis overlooks this second side of the balance (after overestimating the first). In doing so, it produces a result with deeply troubling implications.

When it enacted § 1 of the Civil Rights Act of 1871 (now codified as 42 U.S.C. § 1983), "Congress intended to "`throw open the doors of the United States courts' to individuals who were threatened with, or who had suffered, the deprivation of constitutional rights, and to provide these individuals immediate access to the federal courts notwithstanding any provision of state law to the contrary." <u>Patsy</u>, 457 U.S. at 504 (citation omitted) (quoting legislative history). Thus, as the Court explained in <u>Mitchum v. Foster</u>, 407 U.S. 225, 242 (1972): "The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights . . . ." In enacting legislation to make the federal courts "the <u>primary</u> and powerful reliances" for vindicating federal rights under § 1983, <u>Steffel</u>, 415 U.S. at 464 (emphasis in original), Congress was fully aware of and undeterred by competing concerns of comity and federalism. As the Court has stated, "Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights." <u>Mitchum</u>, 407 U.S. at 242. It did so, nonetheless, to create "a uniquely federal remedy against incursions under the claimed authority of

45

state law upon rights secured by the Constitution and the laws of the Nation." Id. at 239.

Today, the majority holds that individuals allegedly deprived of constitutional rights during the adjudication of their claims before a state agency cannot pursue a § 1983 claim in federal court -- even after the administrative process is no longer pending, and even when they no longer have any recourse within the state system.[0] Under the majority's ruling, the only federal forum such plaintiffs will ever stand a chance of reaching is the United States Supreme Court; and for a number of easily appreciated reasons, that chance is remote. By so drastically limiting (if not, for all practical purposes, foreclosing) access to the federal courts, today's decision runs directly counter to the purposes Congress sought to achieve in enacting the civil rights legislation under which the plaintiffs brought this suit.

Thus, in concluding that the district court committed an abuse of discretion by exercising its jurisdiction, the

---

[0]    I agree with the majority's point that the plaintiffs lost their opportunity to pursue administrative and then judicial appeals in the state system as a result of their own conduct. In my view, however, Younger abstention is not a device to keep litigants from choosing a federal forum when we feel their cases are better suited to the state agencies or courts. Rather, it is a principle of restraint exercised only where the exercise of jurisdiction would inflict overriding harm to competing values of comity and federalism. Abstention serves to protect state interests and maintain a strong, respectful relationship between the governments making up the federal system -- not to deter prospective plaintiffs from attempting to vindicate their federal rights in federal court.

majority not only overstates the extent to which comity and federalism concerns are implicated in this case; in addition, and of potentially greater significance, its analysis fails to take into account the vital federal and individual interests at stake in the adjudication of any case brought under § 1983.

### III.

Because I disagree with the majority's conclusion that the district court abused its discretion by failing to abstain under Younger, I will comment very briefly on the merits of the plaintiffs claims.  In my view, there are none.

First, the City is the only remaining defendant in the case, and the plaintiffs have not established that the alleged violation of their constitutional rights occurred as a result of an official custom, practice, or policy under the standard for municipal liability set forth in Monell v. Dept. of Social Services, 436 U.S. 658 (1978), and the related line of cases.  In fact, the City adopted an ordinance expressly prohibiting the decision that gave rise to the plaintiffs' constitutional claims. The officials who presided over Goodman's and O'Neill's hearings overlooked that provision of the City Code, but Philadelphia cannot be held liable for those mistakes.[0]

---

[0]     The plaintiffs argue that even if the hearing examiners had complied with the ordinance and refrained from adjudicating their older tickets, the BAA's utilization of a "Code 41" mechanism would have required the agency to make the same determinations of liability.  First, even if Code 41 was relevant to resolving the substantive issues this case presents, factual disputes over this mechanism's effect and existence at the time of Goodman's and O'Neill's hearings would preclude a grant of summary judgment.  Second, and more

Second, I believe that the district court erred in concluding that Goodman and O'Neill were deprived of their property without due process of law. The City committed such a violation, it reasoned, by failing to notify the plaintiffs that if they failed to appear before the Traffic Court prior to a certain date, their only recourse would be to the BAA.

The BAA is an administrative agency that does not even have the power to enter a civil judgment. The Traffic Court, in contrast, rendered decisions determining criminal guilt. Accordingly, and appropriately, the BAA does not provide ticket recipients with all of the procedural protections and defenses that they could have relied upon in the Traffic Court. However, nobody has suggested that the process the BAA does provide in adjudicating ticket challenges fails to meet constitutional standards. Goodman and O'Neill only argue, and the district court only held, that before the City switched the forum in which

importantly, Code 41 is not important here because the BAA did not employ it. Goodman and O'Neill are attempting to establish municipal liability based on a policy that the City never followed in its dealings with them. Their belief that the BAA would have made Code 41 determinations, and that when that occurred, they would have suffered the same alleged deprivation of due process, does not give them a viable claim against the City. The official conduct that resulted in the constitutional harm the plaintiffs allegedly suffered was the hearing examiners' erroneous decisions to rule on their older tickets -- not the Code 41 mechanism. Under justiciability principles and the standard for municipal liability in § 1983 cases, Goodman and O'Neill cannot pursue a claim based on a rule or policy that never affected them.

48

ticket recipients would have to proceed, it was required to provide notice.

I would not accept that argument (and, I gather, neither would the majority).  The City has replaced one constitutionally adequate process with another.  True, someone who surely would have escaped criminal liability in Traffic Court might not prevail at the BAA.  But everyone who participates in BAA proceedings receives at least the process that is due before the City takes their property.  The City did not warn Goodman and O'Neill that they might lose their access to the Traffic Court; it did, however, provide them with notice of the parking charges against them and a meaningful opportunity to respond to those charges before reaching a decision that they would have to pay their fines.  Given these facts, the plaintiffs have at most suffered a deprivation of <u>process</u> without due process -- not a deprivation of <u>property</u> without due process.  That does not constitute a violation of their Fourteenth Amendment rights.  The Constitution does not require notice and an opportunity to be heard before all rule changes that might effect an outcome.  So long as the new rules are adequate under due process standards -- and, again, no one has suggested that in this case, they are not -- the Fourteenth Amendment is satisfied.  <u>See</u> <u>Sill v. Pennsylvania State Univ.</u>, 462 F.2d 463, 469 (3d Cir. 1972) (rejecting argument that the University violated students' due process rights by subjecting them to disciplinary proceedings before a specially constituted panel that employed its own procedural rules); <u>Crane v. Hahlo</u>, 258 U.S. 142, 147 (1928) ("No

49

one has a vested right in any given mode of procedure; and so long as a substantial and efficient remedy remains or is provided due process of law is not denied by a legislative change."(citations omitted)); see also Maj. Op. at 6-7 n.4.[0]

Thus, in my view, while Goodman and O'Neill may have derived certain advantages from not paying their parking tickets, see Marion Wink, Women Who Love Men Who Don't Pay Their Parking Tickets, Cosmopolitan, April 1993, at 136, a viable § 1983 suit is not among them. I would therefore reverse the district court's decision and remand the case so that judgment could be entered in favor of Philadelphia.

---

[0] The City makes the additional argument that under Parratt v. Taylor, 451 U.S. 527 (1981), the availability of post-deprivation opportunities to challenge the hearing examiners' erroneous decisions provided the plaintiffs with constitutionally adequate process. Because the BAA did provide the plaintiffs with all the process that was due prior to rendering its decisions, however, Parratt and other cases addressing the sufficiency of post-deprivation remedies are irrelevant.

IV.

Justice Frankfurter believed that "petty cases," even more than hard cases, are "calculated to make bad law." United States v. Rabinowitz, 339 U.S. 56, 68 (1950) (Frankfurter, J., dissenting). "The impact of a sordid little case," he explained, "is apt to obscure the implications of the generalization to which the case gives rise." Id. This easily qualifies as a petty case. It is a dispute about a few parking tickets. Collectively, the plaintiffs' financial stake in the outcome is $218.00. The generalization to which today's decision gives rise, however, is an important and, in my view, misguided one.

The majority does not and cannot limit its holding to meritless claims over small stakes. Highly significant constitutional questions do arise in the context of administrative proceedings addressing seemingly minor issues of purely local concern. Yick Wo v. Hopkins, 118 U.S. 356 (1886), is one example that comes to mind. The plaintiffs in Yick Wo challenged a facially innocuous municipal ordinance that empowered a committee of city officials to determine who could and could not operate laundry businesses. The case elicited one of the Supreme Court's earliest and most significant expositions of the Fourteenth Amendment's guarantee that no state shall deny to any person the equal protection of the laws. Needless to say, the scope and importance of issues addressed in administrative proceedings -- and consequently, the significance of the legal questions that arise from agency decision-making -- has steadily and dramatically increased during the years since Yick Wo.

51

Even in cases such as the one before us, where the underlying constitutional claims are not so gripping, the rule the majority announces today does not reflect an appropriate balance between concerns of comity and federalism, on the one hand, and the values served by the federal courts meeting their responsibility to decide cases over which they have jurisdiction, on the other -- especially when that jurisdiction has been conferred by legislation intended to provide plaintiffs alleging that they have been deprived of federal rights under color of state law with direct access to a federal forum.  Thus, in my view, the majority's treatment of this petty case misapprehends even the general principles of "Our Federalism" it purports to defend.

For these reasons, I respectfully dissent.