Harvard **DULTZ**, Matilda **Romagnoli** and Michalena **Woolley**, Plaintiffs,

v.

Jennifer **VELEZ**, Commissioner New Jersey Department of Human Services, et al., Defendants.

Civil Action No. 09–1049 (FLW).

United States District Court, D. New Jersey.

March 30, 2010.

John William Callinan, Wall, NJ, for Plaintiffs.

Zoe Jeanne McLaughlin, Office of the NJ Attorney General, Dianna Rosenheim State of New Jersey, Trenton, NJ, for Defendants.

## Opinion

WOLFSON, District Judge:

Presently before the Court is Defendants' Motion to Dismiss Plaintiffs' Complaint for injunctive and declaratory relief against the New Jersey Department of Human Services and Division of Medical Assistance and Health Services pursuant to 42 U.S.C. § 1983 ("section 1983") and the Supremacy Clause of the U.S. Constitution. Defendants argue that Plaintiffs have no enforceable right under section 1983 and, in any event, this court should abstain under the *Younger* abstention doctrine. For the following reasons, Defendants' motion to dismiss is denied.

## I. BACKGROUND

Plaintiffs are elderly individuals residing in assistant living residences who applied for benefits under New Jersey's home- and community-based services Medicaid waiver program ("HCB-services"). *See* Am. Compl. at ¶ 3. This program assists eligible individuals with the costs of their assisted living residences.[1] Defendants Jennifer Velez, Commissioner of the New Jersey Department of Human Services ("DHS") and John R. Guhl, Director of the New Jersey Division of Medical Assistance and Health Services ("DMAHS"), are responsible for administering this program. Each plaintiff applied for HCB-services and was denied immediate participation as explained in more detail fully *infra*. Plaintiffs brought this suit to challenge their denials, asserting claims under section 1983 and the Supremacy Clause for violation of the federal Medicaid Act, 42 U.S.C. § 1396 *et seq.*,

### A. *New Jersey's Medicaid Administrative Process*

■■■ A cooperative federal-state program, the Medicaid Act is jointly financed by states and the federal government. *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 501, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). The Medicaid program provides medical assistance to low income individuals. *West Virginia Univ. Hosps., Inc. v. Casey,* 885 F.2d 11, 15 (3d Cir. 1989). State participation in the program is voluntary; however, once a state chooses to participate, it must comply with the provisions of the Medicaid Act and its accompanying regulations. *Sabree v. Richman,* 367 F.3d 180, 182 (3d Cir.2004). States seeking to participate must submit a "plan for medical assistance" to the U.S. Secretary of Health & Human Services, and have that plan approved. *See* 42 U.S.C. § 1396a(a). The plan should contain a "comprehensive written statement submitted by the [state] describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of [the Medicaid Act and accompanying regulations]." 42 CFR § 430.10. Included within the Medicaid Act are financial eligibility guidelines, and provisions related to the transfer of assets by certain Medicaid applicants.[2] *See e.g.,* 42 U.S.C. § 1396p(c) (requiring states to im-

---

1. An assisted living residence is a long-term care facility comprised of independent, apartment-like units with private bathrooms and kitchenettes. *See generally Assisted Living Assoc. of Moorestown, LLC v. Moorestown Twp.,* 996 F.Supp. 409, 415–16 (D.N.J.1998). The services provided by such a facility can be tailored to an individual's needs and promote more autonomy, privacy and dignity than most nursing home settings. *Id.*

2. As aptly noted by the court in *Johnson v. Guhl,* relaying the Fourth Circuit assessment

of the Medicaid Act's financial eligibility provisions,

> [t]here can be no doubt but that the statutes and provisions in question, involving the financing of Medicare and Medicaid, are among the most completely impenetrable texts within human experience. Indeed, one approaches them at the level of specificity herein demanded with dread, for not only are they dense reading of the most tortuous kind, but Congress also revisits the area frequently, generously cutting and pruning

pose a penalty period upon applicants who transfer assets for less than market value).

New Jersey authorizes its participation in the Medicaid program through the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D–1, *et seq.*, *See generally, Johnson v. Guhl*, 91 F.Supp.2d 754, 760 (D.N.J.2000). As noted, DMAHS, an agency contained within DHS, generally administers New Jersey's Medicaid program. *See* N.J.S.A. 30:4D–4; N.J.A.C. § 10:49–1.1(a). Assisted living-related Medicaid waiver services, such as those denied plaintiffs here, are administered by the Department of Health & Senior Services ("DHSS") instead. *See* § N.J.A.C. § 10:49–1.1(b).[3]

Initial applications for Medicaid waiver services must be made through the County Boards of Social Services ("CBOSS"). These county welfare agencies assist the state agency in administering Medicaid "by processing applications ... including determining whether an applicant has met the income and resource eligibility standards." N.J.S.A. 30:4D–7a; N.J.A.C. 10:71–3.15. CBOSS staff members review information received from an applicant in making their determination. They also conduct their own investigations to verify the information. *See e.g.,* N.J.A.C. 10:71–3.13(a) ("The CBOSS shall furnish the Medical Review Team with current, pertinent social and medical information, and obtain any special or additional reports on request.").

When CBOSS denies an application, the denied applicant has the option of seeking a "fair hearing" before an Administrative Law Judge (ALJ) to challenge the denial. *See* 42 C.F.R. 431.1; N.J.A.C. 10:49–10.3.[4] To exercise that option, the applicant must request the hearing within twenty days of the adverse decision. *See* N.J.A.C. 10:49–10.3(b). If a hearing is granted, the ALJ issues an initial decision based on testimony, documents, and arguments, stipulations, and matters of judicial notice. N.J.A.C. 10:49–10.6 (incorporating N.J.A.C. 1:1–18.1's hearing requirements).[5]

---

in the process and making any solid grasp of the matters addressed merely a passing phase.
91 F.Supp.2d 754, 758 (D.N.J.2000) (quoting *Rehabilitation Ass'n of Virginia v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir.1994)). *Cf. Roach v. Morse*, 440 F.3d 53, 58–59 (2d Cir. 2006) ("The statutory scheme governing the Medicaid program is of unparalleled complexity.") (internal quotation marks and citations omitted).

3. Governor Whitman's Reorganization Plan No. 001–1996 gives the Department of Health and Senior Services (DHSS) legal authority to administer several components of the Medicaid program. These components include ... the Assisted Living/Alternate Family Care (AL/AFC) waiver, and peer grouping. Rules for these Medicaid program components are promulgated by DHSS. Accordingly, providers must contact DHSS regarding requirements for these services.
N.J.A.C. § 10:49–1.1(b). As of 2009, and as explained in more detail *infra*, the Assisted Living waiver is now part of the Global Op-

tions Long-term Care Waiver program through which plaintiffs must now seek services.

4. Under the New Jersey Administrative Code,
[a]n opportunity for a fair hearing shall be granted to all claimants requesting a hearing because their claims for medical assistance are denied ... or because they believe the Medicaid Agent ... erroneously terminated, reduced or suspended their assistance....
N.J.A.C. 10:49–10.3.

5. Under the federal Medicaid regulations, a state's hearing system must either provide for a "hearing before the agency", 42 C.F.R. 431.205(b)(1), or "[a]n evidentiary hearing at the local level, with a right of appeal to a State agency hearing." 42 C.F.R. 431.205(b)(2). Further, "[t]he hearing system must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and any additional standards specified in [42 C.F.R. 431.200 *et seq.*]." 42 C.F.R. 431.205(d).

An unfavorable decision by the ALJ may be appealed to the Director of the DMAHS by the aggrieved party filing "exceptions." N.J.A.C. 1:1–18.4(a). Whether or not exceptions are filed, the Director must adopt, modify, or reverse the ALJ's decision. N.J.A.C. 1:1–18.6; N.J.A.C. 10:49–10.12. If the Director does not act, the ALJ's decision becomes final. N.J.A.C. 1:1–18.6(e). An applicant has a right to appeal the Director's decision to the New Jersey Superior Court, Appellate Division. N.J. Ct. R. 2:2–3(a)(2). In connection with an appeal to the Appellate Division, parties may raise constitutional claims. *See Loigman v. Township Committee of Tp. of Middletown*, 185 N.J. 566, 578, 889 A.2d 426 (2006) ("[Section] 1983 allows a person who has been denied his constitutional rights by an official acting under color of state law to seek redress both in state and federal courts.").

### B. *New Jersey's Assisted Living–Related Medicaid Waiver Program*

■ In 2001, New Jersey created the Enhanced Community Options (ECO) Medicaid Waiver program in order to facilitate community-based care options for qualified individuals who would otherwise require care at a nursing facility. *See* N.J.A.C. 10:60–10.1; Medicaid Communication No. 00–10, Enhanced Community Options (ECO) Medicaid Waiver and Jersey Assistance for Community Caregiving (JACC) Program, *http://www.state.nj.us/humanservices/dmahs/info/resources/medicaid/# 11* at 4 (May 22, 2000) (hereinafter "Med. Comm. 00–10") (visited March 30, 2010). A Medicaid "waiver" program is one designed for those who are "medically needy," though they not be "categori-

cally needy" such that they cannot cover the costs of their basic needs and/or are receiving public assistance. *Roach v. Morse*, 440 F.3d 53, 59 (2d Cir.2006); 42 U.S.C. § 1396a(a)(10)(A)(i)(II). In other words, the medically needy are those have sufficient income to cover their basic needs, but insufficient income to cover their necessary medical care. *Roach*, 440 F.3d at 59.

The ECO Waiver provided financial assistance to individuals receiving care in an assisted living facility. N.J.A.C. 10:60–1.1. Applicants were required to demonstrate that they met the Medicaid financial eligibility requirements. *See* Community Choice, Dept. of Health & Senior Services, *http://www.state.nj.us/health/senior/ccbrochure/cchoice14.shtml* (visited March 11, 2010). Once approved for participation in the program, the individuals' medical care expenses were paid by the State. The individual was responsible for his or her housing expenses at the assisted living facility. *Id.*

On January 1, 2009, near the time Plaintiffs' applications were denied, DMAHS consolidated its ECO Waiver program into the Global Options Long–Term Care Waiver ("GO") program. *See* Health/Medical Programs, Dept. of Health & Senior Svcs, *http://www.state.nj.us/health/senior/benefits/health.shtml# longterm* (visited March 11, 2010).[6] The eligibility qualifications under the GO program are the same as under the ECO Waiver program; to qualify, an individual must be 65 years of age or older, clinically and financially eligible for Medicaid nursing facility level of care, and display a reasonable indication that he or she needs an institutional level

---

6. Effective January 1, 2009 the special Medicaid type programs Adult Family Care (AFC), Assisted Living (AL), Caregiver Assistance Program (CAP) and Community Care Program for the Elderly and Disabled (CCPED) were replaced with a single program called Global Options (GO) for Long Term Care. The GO makes access to programs faster, easier and allows greater choice in care services. *Id.*

of care. *See generally* N.J.A.C. 10:60–10.2; N.J.A.C. 10:71–3.1 *et seq.;* N.J.A.C. 8:85–1.8.

### C. *Medicaid Income and Resource Eligibility and Look-back Periods*

Under the federal Medicaid Act, "the State plan must provide that if [a non-]institutionalized individual . . . disposes of assets for less than fair market value on or after the look-back date . . . , the individual is ineligible for medical assistance for services during the period beginning on the date specified in subparagraph (D) and equal to the number of months specified in subparagraph (E)." 42 U.S.C. § 1396p(c)(1)(A). Upon completing the calculation whose terms are supplied by subparagraphs (D) and (E), one can compute the penalty period applicable to a non-institutionalized applicant who transferred property for less than full value within the look-back period. The look-back period is up to five years preceding the individual's Medicaid waiver application, for those transfers made on or after February 8, 2006. *See* 42 U.S.C. § 1396p(c)(1)(B)(i).

### D. *Plaintiffs' Transfers of Assets and Medicaid Waiver Denials*

Plaintiffs each applied for Medicaid waiver benefits (initially under the ECO Waiver Program, which was then incorporated into the Global Options Long–Term Care Waiver program). It is alleged that each applicant is medically needy, and otherwise meets the financial and medical requirements of the Medicaid waiver program. *See* Am. Compl. ¶¶ 29, 33–35, 49. And, each Plaintiff was denied benefits, at least temporarily, on account of having transferred property for less than full value during the look-back period.

Plaintiff Woolley disclosed her uncompensated transfer in her application for the ECO Waiver program. Am. Compl., ¶ 39. DMAHS denied her application on May 8, 2007, by way of letter of that date. *Id.* at ¶ 40. In its denial letter, DMAHS cited Woolley's uncompensated transfer as the reason for her denial. *Id.,* Exh. A. It imposed a penalty of twenty-two (22) months and two (2) days, beginning on December 1, 2006. *Id.* Upon expiration of this penalty period, Woolley reapplied for benefits in or about October 2008. *Id.* at ¶ 41. DMAHS issued a second denial letter on January 16, 2009, noting that, because of the uncompensated transfer disclosed in her initial application, she is "ineligible for coverage . . . unless the funds are returned to the client, and the client spends down the money." *Id.,* Exh. B. In other words, DMAHS refused to apply a penalty period to Woolley, but rather completely barred her from receiving assisted living services under the ECO Waiver program unless she repurchased the transferred asset and spent the proceeds.

Plaintiff Romagnoli, like Woolley, disclosed her 2006 uncompensated transfer in her application for services. *Id.* at ¶ 39. DMAHS issued her denial letter in April of 2009, noting that "due to the transfer of assets at less than fair market value after February 8th, 2006, . . a penalty must be assessed *when nursing home services begin." Id.,* Exh. C (emphasis added). Thus, as with Woolley's second denial, DMAHS did not compute a penalty period applicable to Romagnoli. According to DMAHS, "SINCE THE GLOBAL OPTIONS/ASSISTED LIVING MEDICAID IS A WAIVER PROGRAM WHICH DOES NOT INCLUDE NURSING HOME SERVICES, A PENALTY CANNOT BE ASSESSED AND YOU HAVE BEEN DEEMED INELIGIBLE." *Id.*

Plaintiff Dultz, unlike both Woolley and Romagnoli, was already receiving Medicaid assisted-living related waiver services at the time he disclosed his uncompensated

transfer. Am. Compl., ¶ 37. On December 24, 2008, DMAHS imposed a penalty period of nine (9) months and twenty-six (26) days upon Dultz, by way of letter of that date. *Id.*, Exh. D. Shortly thereafter, on January 23, 2009, DMAHS issued a second letter terminating his waiver benefits. Am. Compl., Exh. E. In May of 2009, after the instant action was filed, DMAHS revised Dultz's penalty period, decreasing it by fourteen (14) days and setting the period's expiration as October 12, 2009. Am. Compl., Exh. F.

### E. *Plaintiffs' Federal Lawsuit*

After Plaintiffs were denied admission to the Medicaid waiver program, they brought the instant suit alleging two violations of the Medicaid Act via section 1983. First, Plaintiffs contend that the New Jersey agency "fail[ed] to impose a penalty period against individuals who made transfers of assets." Am. Compl. ¶ 63. Second, they contend the agency "us[ed] a methodology for assessing income and resource eligibility for applicants applying for HCB-services that is more restrictive than the methodology used to determine income and resource eligibility under ... 42 U.S.C. §§ 1396a(r)(2)(A) and 1396p(c)(1) ...." Am. Compl. ¶ 65.[7]

In connection with these contentions, Plaintiffs attached a copy of a 2008 Final Agency Decision by DMAHS which, Plaintiffs assert, explains DMAHS' erroneous interpretation of the Medicaid Act's uncompensated transfer rules and their relation to waiver program eligibility. Am. Compl., Exh. G (hereinafter "Final Agency Decision"). The applicants, in that decision, were non-institutionalized individuals who resided in their communities. They applied for benefits after having transferred assets to family members in order to qualify for Medicaid. *Id.* at 3. Their applications were denied and they appealed the denials through New Jersey's fair hearing process.

The applicants prevailed in an Initial Decision issued by the ALJ, but that success was reversed by the Commissioner of DMAHS in the Final Agency Decision. Before the Commissioner, the applicants argued that a penalty period should be applied to them while they remained in the community, *i.e.*, non-institutionalized. The Commissioner disagreed, interpreting the Medicaid Act to call for a penalty period to begin under only two circumstances. Either the applicant had to enter a nursing home for thirty days, thereby becoming institutionalized and entitled to the drastically reduced, thirty-day waiting period imposed upon institutionalized applicants, or already be receiving waiver services. *Id.* at 3, 5. In addition, and in order to qualify for waiver services, the applicants would need to recoup the assets transferred to family members, *id.* at 3, and otherwise dispose of the assets in accordance with the Medicaid Act's financial eligibility rules.[8] If the family members refused to return the assets, the applicants would be required to file suit against them and seek a hardship waiver from the recoupment requirement. *Id.* at 3.

---

7. It is not clear from the Amended Complaint what precise injury Dultz seeks to redress. Unlike the other co-plaintiffs, a penalty period was assessed against Dultz, and that period has now expired. Further amendment of the Amended Complaint may serve to clarify Dultz's claims.

8. While the Final Agency Decision does not explicitly make this latter point, the applicants would not otherwise satisfy the financial eligibility requirements of the waiver program. This is consistent with DMAHS' denial of Plaintiff Woolley's application, in which it concluded that she was "ineligible for coverage ... unless the funds are returned to the client, and the client spends down the money." Compl., Exh. B.

In short, the Final Agency Decision concludes, for non-institutionalized applicants, that "[t]heir eligibility is contingent on the receipt of waiver services." *Id.* at 6. And, "[w]ithout eligibility, there is no start date for the penalty period." *Id.* at 8.

Through the instant action, Plaintiffs challenge DMAHS' denial of their applications, under the Final Agency Decision's rationale, by seeking declaratory and injunctive relief under section 1983. They request an order requiring defendants to impose a penalty period and redetermine each plaintiff's Medicaid application. Plaintiffs, further, seek attorney's fees and costs.

## II. STANDARD OF REVIEW

In *Bell Atlantic Corporation v. Twombly,* the Supreme Court clarified the Rule 12(b)(6) motion to dismiss standard. 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In that decision, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 556, 127 S.Ct. 1955. Thus, "while a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. 1955.

## III. DISCUSSION

Defendants present two bases for dismissal of Plaintiffs' complaint. First, they argue that the provisions of the federal Medicaid Act relied upon by Plaintiffs do not create rights enforceable under section 1983. Second, they argue that the *Younger* abstention doctrine requires this court to abstain from hearing Plaintiffs' claims.

### A. *Enforceability through Section 1983*

■■■ Section 1983 is a vehicle through which federal rights may be enforced by plaintiffs who suffered a deprivation at the hand of a state official. *Grammer v. John J. Kane Reg. Ctrs.–Glen Hazel,* 570 F.3d 520, 525 (3d Cir.2009). In *Sabree,* the Third Circuit held that a certain provisions of the federal Medicaid Act created rights enforceable via section 1983. In so holding, it applied the test announced in *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), as clarified by the Supreme Court in *Gonzaga Univ. v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). To satisfy this three-part test, the federal statute must (1) create specific, individually enforceable rights, (2) use "rights-creating language," and (3) not preclude individual enforcement. *See Sabree,* 367 F.3d at 183; *Sable v. Velez,* 2009 WL 3379939, *2 (D.N.J.2009). In determining whether the first two elements were met, the *Sabree* Court looked to the statutory text and structure of the federal statute. *Sabree,* 367 F.3d at 189. As to the third element, the Court considered not only whether Congress explicitly precluded individual suits in the statutory language, but also whether Congress implicitly precluded such suits by providing a comprehensive remedial scheme. *Id.* at 193.

The plaintiffs in *Sabree* sought to enforce the right to medical services from an Intermediate Care Facility for Persons with Retardation ("ICF/MR services"). *Id.* at 181, 189. The provisions upon which those plaintiffs relied were 42 U.S.C. § 1396a(a)(10)(A) and § 1396d(a)(15), which state that a participating state "must provide ... medical assistance ... to ... all [eligible] individuals," and defines "medical assistance" to include intermediate care facilities. *Id.* at 189. The plaintiffs also sought to enforce the right to such services with "reasonable prompt-

ness," relying on 42 U.S.C. § 1396a(a)(8). That subsection states, in pertinent part: "A State plan for medical assistance *must ... provide ...* for making medical assistance available, ... to ... [eligible] *individuals ....*" *Sabree,* 367 F.3d at 182 n. 5 (quoting 42 U.S.C. § 1396a(a)(8)) (emphasis in original).

The *Sabree* Court concluded, "without difficulty," that the statutory language created an individually enforceable right. *Id.* at 189. According to the court, the statutory language clearly provides that individuals are the "intended beneficiaries" of the medical services, the rights to be enforced are "specific and enumerated," not "vague and amorphous," and the obligation imposed upon the state is "unambiguous and binding." *Id.* Because the rights were specific and enumerated, there was no concern that its enforcement would strain judicial competence. *See Grammer,* 570 F.3d at 525 (explaining rationale underlying the Supreme Court's insistence on language that is not "vague and amorphous"). As to whether the language is "rights-creating," the *Sabree* Court found that the language was "mandatory rather than precatory" and was focused upon the individual recipient of services. *Sabree,* 367 F.3d at 190.

The statutory structure buttressed the court's interpretation of the text, although the Medicaid Act's general introductory statement and appropriations statement gave the court some pause. *Id.* at 191–92. Those provisions provide that the purpose of the Medicaid Act is to "enabl[e] each State ... to furnish ... medical assistance," 42 U.S.C. § 1396, and that the Secretary of the U.S. Department of Health & Human Services may suspend payments to a state that fails to substantially comply with the Act's terms, 42 U.S.C. § 1396(c). *Sabree,* 367 F.3d at 191–92. Nevertheless, the Court concluded that these provisions "cannot neutralize

the rights-creating language" of the sections relied upon by the plaintiffs. *Id.* at 192.

Turning lastly to whether Congress precluded individual suits, the court concluded that the Medicaid Act does not explicitly preclude such actions. *Id.* at 193. "As a result, there is a substantial burden on a state seeking to establish that Congress has provided a comprehensive remedial scheme with which individual actions cannot be reconciled." *Id.* The *Sabree* Court, further, concluded that the state administrative hearing allowed for by the Medicaid Act does not amount to a comprehensive remedial scheme sufficient to implicitly preclude individual causes of action. *Id.* (citing 42 U.S.C. § 1396a(a)(3)). Notably, the court highlighted the long-standing rule that "[t]he availability of state administrative procedures ordinarily does not foreclose resort to § 1983." *Id.* (quoting *Wilder,* 496 U.S. at 523, 110 S.Ct. 2510).

Relying upon *Sabree,* the district court in *Sable v. Velez* concluded that the Medicaid Act created an enforceable right for plaintiffs who presented claims similar to those presented here. The plaintiffs in *Sable* were denied Medicaid benefits on financial grounds after lending substantial sums of money to their children in return for promissory notes. 2009 WL 3379939 at *1. DMAHS argued, in that case, that the plaintiffs' transfers were similar to trusts, and therefore qualified as countable resources under the Act. *Id.* The plaintiffs pointed to sections 1396a(a)(10)(C)(i)(III) and 1396a(r)(2)(A)(i), which require the state to use methodology no more restrictive than that used in the federal social security program. *Id.* at *2.

The aforementioned sections of the Medicaid Act state that "if medical assistance is included for any group of individuals ... the plan ... shall be no more restrictive than the methodology which would be em-

ployed under the supplemental security income program." *Id.* at \*3 (noting that the language in sections 1396a(a)(10)(C)(i)(III) and 1396a(r)(2)(A)(I) is "substantially identical"). Comparing this language to that interpreted in *Sabree*, the *Sable* court concluded that the methodology provisions created an individually enforceable right and used rights-created language. The court reasoned that the language is mandatory, describes how individuals are to be properly treated, and is focused on the individual.[9] *Id.* Lastly, the *Sable* court cited *Sabree* for the proposition that the Medicaid Act does not explicitly or implicitly preclude individual enforcement of rights. *Id.*

■ I agree with the reasoning of the *Sable* court. In the second count of their Amended Complaint, Plaintiffs here, like those in *Sable*, challenge the financial (resource) methodology used by DMAHS in denying their claims. The provisions relied upon by Plaintiffs are 42 U.S.C. § 1396a(r)(2)(A)—the exact provision analyzed in *Sable*.[10] As the above recitation illustrates, the *Sable* Court's analysis is consistent with the Third Circuit's decision in *Sabree*.

The statutory right cited in connection with Plaintiffs' first count was not addressed by either *Sabree* or *Sable*. Plaintiffs rely upon section 1396p(c)(1) which sets forth detailed instructions as to how to calculate the penalty period applicable to uncompensated transfers. It, states, in pertinent part:

the State plan *must* provide that if an institutionalized individual ... (or, at the

option of a State, a non-institutionalized individual ...) disposes of assets for less than fair market value on or after the look-back date specified in subparagraph (B)(i), *the individual is ineligible for medical assistance* for services described in subparagraph (C)(i) (or, in the case of a non-institutionalized individual, for the services described in subparagraph (C)(ii)) *during the period* beginning on the date specified in subparagraph (D) and equal to the number of months specified in subparagraph (E).

42 U.S.C. § 1396p(c)(1)(A) (emphasis added). The remaining subsections of § 1396p(c)(1), and there are many, specify exactly how to calculate the penalty period.[11] *See e.g.,* 42 U.S.C. § 1396p(c)(1)(B)(i) (specifying the number of months of the penalty period, depending upon whether the transfer was made before or after February 8, 2006); 42 U.S.C. § 1396p(c)(1)(B)(ii) (specifying the type of medical assistance to which the uncompensated transfer rules apply depending upon whether the applicant is institutionalized or non-institutionalized at the time of application).

The language of § 1396p(c)(1) is sufficiently similar to that in *Sabree* and *Sable* to warrant the same result. For one, the text clearly designated "individuals" as the provision's beneficiaries by prescribing a time-limited penalty period after which the individuals are eligible for services. *Accord Grammer,* 570 F.3d at 529–30 (reasoning that Congress' use of "residents" in the Medicaid Act's nursing home provision,

---

9. That the text speaks of "the Plan" did not undermine the court's conclusion that the provisions were individually focused, the *Sable* court reasoned, because the passage analyzed in *Sabree* contained similar language. *Id.*

10. Plaintiffs also cite 42 U.S.C. § 1396p(c)(1) in connection with their second count. Am.

Compl., ¶ 65. That provision, as noted herein, sets the penalty period for uncompensated transfers. Because this provision forms the basis for Plaintiff's second count, I do not also address it in connection with my analysis of their first count.

11. The full text of § 1396p(c)(1) is attached as Appendix A to this Opinion.

42 U.S.C. § 1396r, is "clearly phrased in terms of the persons benefitted"). While the penalty period is punitive, which might suggest that the provision was designed to benefit the State by limiting eligibility, that Congress set forth detailed calculations as to the accrual and length of the period makes clear that Congress meant protect those individuals who made uncompensated transfers from undue penalty by the State. Otherwise, Congress would have left the details to State discretion. Furthermore, the subsections setting forth the means by which the penalty period is calculated are meticulously detailed and specific, making it possible for courts to interpret and apply the penalty period without straining judicial resources.

In addition, § 1396p(c)(1) uses mandatory, rather than precatory language, by providing that the State plan "must" provide that an individual is ineligible "during [a] period." This mandatory language dictates how the State is to assess a penalty against the individual. Such individually-focused, mandatory language is "rights-creating." *Sabree*, 367 F.3d at 190; *Sable*, 2009 WL 3379939 at *3. The structure of the statute—including the numerous subsections addressing the formulas to be used to determine the penalty period along with specifications as to how to apply the rules to non-institutionalized individuals—buttresses my conclusion that § 1396p(c)(1) creates an individually enforceable right. *Accord James v. Richman*, 547 F.3d 214, 219 (3d Cir.2008) ("Medicaid is established through an exhaustive set of statutes that thoroughly detail what benefits are to be available and to whom they should be provided."); *id.* ("In addition, Congress provided a detailed set of rules governing [financial] transac-

tions that it considered suspicious....") That the Medicaid Act as a whole contains provisions speaking to Congressional enforcement does not undermine the specific rights-creating language of § 1396p(c)(1). *See Grammer*, 570 F.3d at 531 (reaffirming *Sabree's* holding in this regard; noting that "[t]he scenery [of the Medicaid Act] has not changed since our opinion in *Sabree.*") And, *Sabree* held that Congress has not implicitly or explicitly foreclosed the § 1983 remedy through the Medicaid Act or its remedial structure.

Accordingly, I conclude that the Medicaid Act creates enforceable rights related to both of Plaintiffs' causes of action. *Cf. Tristani v. Richman*, 609 F.Supp.2d 423 (W.D.Pa.2009) (holding that Medicaid Act creates enforceable right to waiver services); *Susan J. v. Riley*, 254 F.R.D. 439 (M.D.Ala.2008) (same). This is not to say that Plaintiffs will ultimately prevail on their challenges to DMAHS' denial of applications. Indeed, in Sable, those plaintiffs failed in their attempt to secure a preliminary injunction against DMAHS because they could not demonstrate a likelihood of success on the merits at trial. 2009 WL 3379939 at *6, n. 2. That the Medicaid Act creates enforceable rights for Plaintiffs is a separate question from whether they will be able to prove that those rights were actually violated by the State.

### B. *Younger Abstention*

 Under the *Younger* abstention doctrine, rooted in the Supreme Court's *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) decision, federal courts should abstain from hearing cases related to certain state administrative proceedings.[12] *O'Neill v. City of Phil-*

---

**12.** To be clear, the State is not challenging this court's jurisdiction over plaintiffs' causes of action. Nor could it. *See James v. Richman*, 547 F.3d 214, 217 (3d Cir.2008) ("The

District Court had federal question jurisdiction, as the primary issue presented was whether the Department has misinterpreted

*adelphia,* 32 F.3d 785, 789 (3d Cir.1994). To qualify for *Younger* abstention,

> (1) there must be pending or ongoing state proceedings which are judicial in nature; (2) the state proceedings must implicate important state interests; and, (3) the state proceedings must afford an adequate opportunity to raise any constitutional issues.

*Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

Citing *Younger* generally, the State argues that abstention is warranted in this case. In its view, Plaintiffs are obligated to "have their claims heard through the State administrative and appeals process" because the state courts provide adequate redress for their challenges. Def. Open. Br. at 8. The Medicaid Act, the State continues, requires states to "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied." *See id.* at 10 (quoting 42 U.S.C. § 1396a(a)(3)). And, New Jersey law provides that all final agency decisions may be appealed, as of right, to the New Jersey courts where statutory and constitutional challenges may be brought. *See id.* at 8 (citing N.J. Ct. R. 2:2–3(a)(2)).

Plaintiffs, in response, make two points. First, they argue that there are no pending judicial proceedings. While they acknowledge the existence of the state administrative and appeals process, they aver simply that they chose the federal forum instead by pursuing their claims under section 1983. Second, they argue that the state administrative proceedings are remedial in nature and, therefore, fall outside the bounds of *Younger* abstention. Choos-

---

federal law regarding [plaintiff's] right to Medicaid benefits."); *see also generally Hi Tech Trans, LLC v. New Jersey,* 382 F.3d 295, 306 (3d Cir.2004) (discussing intersection of federal preemption claims, resulting in feder-

ing not to file a reply brief, the State has failed to address this latter argument. The State's failure, in this regard, could be viewed as a waiver—abstention, unlike jurisdiction, may be waived by the parties. *See Dayton,* 477 U.S. at 626, 106 S.Ct. 2718 ("A State may of course voluntarily submit to federal jurisdiction even though it might have had a tenable claim for abstention."); *Addiction Specialists, Inc. v. Twp. of Hampton,* 411 F.3d 399, 409 (3d Cir.2005) (citations omitted). *But see O'Neill,* 32 F.3d at 786 n. 1 (suggesting that *Younger* abstention should be considered *sua sponte* ) (citing *Bellotti v. Baird,* 428 U.S. 132, 143–44 n. 10, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976)). I will not rest my decision on any potential waiver, however, because *Younger's* inapplicability to this case is clear as a matter of law.

### 1. *"Pending" State Judicial Proceeding*

Plaintiffs contend that there is no pending state judicial proceeding because they merely applied for services, and chose not to seek administrative review of the County Board's imposition of a penalty. As noted *supra,* a decision of the County Board may be appealed through the administrative chain of command. Once the administrative review is finalized by the Director of DMAHS, the decision may then be subject to judicial review in the state courts.

Here, two of the Plaintiffs (Romagnoli and Woolley) applied for benefits through the County Board and their requests were denied. The denial letters set forth the procedure of requesting a fair hearing: "You have the right to request a Fair Hearing on this action ... within 20 days...." Am. Compl., Exh. B–C. These

---

al question jurisdiction, and abstention doctrines). Rather, the State argues that this court should abstain from exercising its jurisdiction under the *Younger* abstention doctrine.

plaintiffs did not request a fair hearing. For these reasons, Plaintiffs argue, it cannot be said that there exists a "pending" state administrative proceeding.

The State, on the other hand, argues that the question is not whether there is a "currently pending state proceeding" but whether "the federal plaintiff had an adequate *opportunity* to resolve the federal issue in a state proceeding." Def. Br. at 8 (emphasis added). Because the plaintiffs could have chosen to challenge the County Board's determination in state court, the State argues, Plaintiffs are foreclosed from challenging the Board's decision in federal court. In support of its position, the State cites *W.K., Jr. v. New Jersey Div. of Dev. Disabilities*, 974 F.Supp. 791, 795 (D.N.J. 1997) (hereinafter "*W.K.*").

*W.K.* involved application of the *Younger* doctrine to a federal plaintiff's challenge to administrative denial of benefits by the New Jersey Division of Developmental Disabilities ("DDD"). The plaintiff in that case resided in a residential program for people with special needs. *Id.* at 793. When plaintiff's parents sought financial assistance to cover the increasing costs of his care, he was placed in the "urgent" category, denoting that he needed services quickly. *Id.* DDD notified plaintiff's parents that there were no vacancies in the programs that would assist their son.

Dissatisfied with this response, the parents sent a letter to DDD stating "that the family appeals the failure to provide appropriate services." *Id.* DDD wrote back to the parents, stating that it did not believe any factfinding was necessary yet it would be willing to hold a meeting to "give [the parents] an opportunity to present additional facts." *Id.* at 793–94. The parents rejected the offer for a meeting, instead demanding a hearing before New Jersey's Office of Administrative Law. When that demand was not met favorably, the parents, on behalf of their son, brought a section 1983 claim for violation of procedural or substantive due process in federal court. *Id.* at 794.

Ruling in favor of DDD, the district court held that *Younger* abstention was appropriate. The plaintiffs in that case did not dispute that their claim was the subject of ongoing state proceedings. *Id.* at 794. Because the plaintiffs instituted the appellate review process, but did not see it to its completion, the district court reasoned that the proceedings were still pending. Moreover, the court reasoned, "it is sufficient that the federal plaintiff has an adequate opportunity to resolve the federal issues in a state proceeding" for the court to find that there exists a "pending" state proceeding. *Id.* at 795. In support of this reasoning, the court cited both *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) and *O'Neill*, 32 F.3d at 790–91, for the proposition that "*Younger* abstention [is] proper where a federal claimant failed to pursue state-court judicial review of an unfavorable state administrative determination . . . ." *W.K.*, 974 F.Supp. at 795.

As an initial matter, I find *W.K.* distinguishable on its facts. The plaintiff in *W.K.* initiated an appeal at the state level and then abandoned it by refusing to accept DDD's meeting during which their arguments could be heard. Here, by contrast, the plaintiffs never invoked the state appellate process. Once their application for benefits were denied, they did not request a hearing. Instead, they selected the federal forum by filing their section 1983 action.

For this reason, the *W.K.* court's reference to *Huffman* and *O'Neill* may not attend here. The question before those courts was whether a federal plaintiff who failed to pursue *judicial* review at the state level was foreclosed by *Younger* from suing in federal court. Neither court ad-

dressed whether a plaintiff who did not pursue state *administrative* review is likewise foreclosed. *See O'Neill,* 32 F.3d at 790 (explaining *Huffman* as holding that a federal claimant who failed to appeal a state trial court judgment may not file suit in federal court); *id.* (describing the issue before the Court as "whether a state proceeding is 'pending' ... where the adjudicatory process has become final as a result of the federal claimant's failure to pursue state-court *judicial* review of an unfavorable state administrative determination.") (emphasis added).

More importantly, the Third Circuit in *Sabree* explicitly rejected the notion that a failure to pursue a state administrative remedy under the Medicaid Act forecloses an action under section 1983. The Court discussed § 1396a(a)(3), the provision also cited by Defendants here, which provision allows for state administrative hearings:

A State plan for medical assistance must ... provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied....

42 U.S.C. § 1396a(a)(3) *cited in Sabree,* 367 F.3d at 193 n. 29. Interpreting this provision's relationship to section 1983 actions, the Court unequivocally stated "[a] plaintiff's ability to invoke § 1983 cannot be defeated simply by 'the availability of administrative mechanisms to protect the plaintiff's interests." *Sabree,* 367 F.3d at 193. While the Court was not addressing the *Younger* doctrine, its statement is nonetheless instructive here.

Furthermore, I question the viability of *W.K.* because it does not take into account *O'Neill's* coercive versus remedial distinction. The plaintiffs in *O'Neill* were individuals who had been cited for several traffic violations in the City of Philadelphia. While initially choosing not to challenge any of their tickets, the plaintiffs

later changed their minds and requested hearings before the appropriate state administrative agency. *Id.* at 788. In the meantime, Philadelphia revised its administrative process changing traffic violations from criminal to civil proceedings. *Id.* at 787. One outcome of this change was that individuals were subjected to a less stringent burden of proof, *inter alia. Id.* In pursuing their challenge through the revised system, plaintiffs' challenges to their tickets were rejected by the state agency. Rather than appealing the agency's decision, the plaintiffs filed section 1983 actions in federal court asserting that their due process rights were violated by the revised system. *Id.* at 789.

Holding that *Younger* abstention was required, the Third Circuit noted the critical distinction between coercive and remedial state administrative proceedings. *Id.* at 791 n. 13. This notation was occasioned by the following apparent inconsistency. According to the Supreme Court's decision in *Patsy v. Florida Bd. of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), section 1983 actions need not be exhausted at the state level. Yet, as noted herein, the Supreme Court has held *Younger* applicable to certain pending state administrative proceedings.

The Third Circuit, as did the Supreme Court in *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (*"Dayton"*), reconciles this apparent inconsistency by limiting *Younger's* application to coercive administrative proceedings only. The *O'Neill* Court explains:

The critical distinction between *Dayton Christian Schools* and *Patsy* is that *Patsy* involved a *remedial* action brought by the plaintiff to vindicate a wrong which had been inflicted by the State. In contrast, *Dayton Christian Schools* involved an administrative proceedings [sic] initi-

ated by the State, before a state forum, to enforce a violation of state law. That is, in *Dayton Christian Schools,* the action taken by the Ohio Civil Rights Commission was *coercive* rather than remedial....

32 F.3d at 791, n. 13 (emphasis added). The *O'Neill* Court went on to conclude that "the action taken by the City of Philadelphia, to enforce its traffic tickets against O'Neill and Goodman, was coercive action which the plaintiffs sought to circumvent by filing their complaint in federal court." *Id.*

As one law review author succinctly defines coercive proceedings, "*Younger* applies to state proceedings which are coercive in nature; that is, in cases where the plaintiff in the federal case is the target of some *state enforcement, criminal, or disciplinary process.*" Michael M. Berger, *Takings Issues: Supreme Bait & Switch: The Ripeness Ruse in Regulatory Takings,* 3 Wash. U. J.L. & Pol'y 99, 117 (2000) (emphasis added). *See also Illinois v. General Elec. Co.,* 683 F.2d 206, 213 (7th Cir.1982) (reading *Younger's* progeny as limited to cases in which the federal plaintiff violated state law, noting that "one who decides to violate a state law that he believes to be unconstitutional may find that he has thereby submitted himself to the jurisdiction of the state courts").

The Third Circuit, and district court cases within the Circuit, follow this definition of coercive proceedings, *i.e.,* proceedings brought by the state to enforce violations of its own laws or processes. *See e.g., Getson v. New Jersey,* 352 Fed.Appx. 749 (3d Cir.2009) (applying *Younger* to state administrative license revocation proceeding in which federal plaintiff charged with gross negligence and other forms of misconduct that violated state law); *Wyatt v. Keating,* 130 Fed.Appx. 511 (3d Cir. 2005) (holding that plaintiff's malicious prosecution challenge was remedial be-

cause it was "not instituted by the state to penalize an alleged violation of law"); *Zahl v. Harper,* 282 F.3d 204, 209 (3d Cir.2002) (holding that state administrative enforcement proceedings against medical practitioner are "pending state proceedings" under *Younger*); *O'Neill,* 32 F.3d at 791 n. 13 (applying *Younger* to suit involving administrative "action taken by the City of Philadelphia, to enforce its traffic tickets against the plaintiffs"); *Sable v. Velez,* 2009 WL 3379939 at *4 (defining coercive proceedings as "brought by the state to enforce its own laws"); *Antonelli v. New Jersey,* 310 F.Supp.2d 700, 711–12 (D.N.J. 2004) (holding that administrative appeals by plaintiffs to Merit System Board of New Jersey Department of Personnel challenging allegedly discriminatory employment test was not coercive because was not "an end run around state *enforcement* efforts ...." ) (emphasis added); *Assisted Living Assoc.,* 996 F.Supp. at 431 ("[I]t is the state's interest in *enforcing* its law against a private party which has always been protected.") (emphasis in original).

The Third Circuit has recently expressed its adherence, *albeit* in unpublished decisions, to the coercive/remedial distinction and the notion that coercive proceedings are initiated by the state to enforce its own laws. In *Wyatt v. Keating,* for example, a federal plaintiff filed a section 1983 action claiming that he was maliciously prosecuted in connection with the revocation of his insurance license by a state agency, which revocation was reversed on appeal through the state courts. *Id.* at 513. The *Wyatt* Court relied upon *O'Neill* to conclude that *Younger* did not bar his claim:

[T]he appeals process that Wyatt initiated in order to get his license reinstated was a remedial process, because it was initiated by Wyatt at his own option to remedy a perceived wrong by the

state—the revocation of his license. *It was not coercive because it was not instituted by the state to penalize an alleged violation of law by Wyatt.* 130 Fed.Appx. at 514–15 (citing *O'Neill*, 32 F.3d at 791 n. 13) (emphasis added).[13] In 2009, the Third Circuit applied *Younger* in the context of a license revocation proceeding challenge. *See Getson v. New Jersey, supra.*

Thus, what is noticeably missing from the *W.K.* court's analysis is whether the DDD administrative action in that case was coercive or remedial. It cannot be said that the administrative action—the denial of financial assistance to an individual with special needs—constitutes coercive action. There was no allegation or finding that the plaintiff in that case violated any state law. Rather, DDD merely concluded that the plaintiff was not entitled to pecuniary benefits. In this way, the administrative action is clearly distinguishable from that in *O'Neill* where the plaintiffs were charged by the state with violating traffic laws. For this reason, I choose not to apply the reasoning of *W.K.* here. *Accord Sable v. Velez,* 2009 WL 3379939 at *4 n. 1.

█ I conclude, instead, that the administrative proceedings (to the extent denied applications can be viewed as proceedings) in this case are remedial in nature and, therefore, do not form the predicate for abstention under *Younger.* Plaintiffs filed applications for benefits with the local County Boards of Social Services, CBOSS. Their subsequent section 1983 action in this court is a challenge to the CBOSS' denial of their requests for services, and refusal to apply penalty periods to them as

non-institutionalized individuals. The denials of Plaintiffs' applications did not seek to enforce New Jersey's law against Plaintiffs. They merely deny benefits sought by plaintiffs. Moreover, as noted in *Sabree* and discussed in more detail above, Plaintiffs are not required to request fair hearings prior to instituting suit under section 1983. 367 F.3d at 193; *accord Roach v. Morse,* 440 F.3d at 58. Accordingly, this court will not abstain under *Younger.*

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED.

## APPENDIX A

(c) Taking into account certain transfers of assets

(1)(A) In order to meet the requirements of this subsection for purposes of section 1396a(a)(18) of this title, the State plan must provide that if an institutionalized individual or the spouse of such an individual (or, at the option of a State, a non-institutionalized individual or the spouse of such an individual) disposes of assets for less than fair market value on or after the look-back date specified in subparagraph (B)(i), the individual is ineligible for medical assistance for services described in subparagraph (C)(i) (or, in the case of a non-institutionalized individual, for the services described in subparagraph (C)(ii)) during the period beginning on the date specified in subparagraph (D) and equal to the number of months specified in subparagraph (E).

---

**13.** At first blush, it would appear that the court could have viewed Wyatt's administrative process as coercive because it arose out of the state's enforcement of its laws in connection with revoking his license. However, his license was revoked by the state without a proceeding. Wyatt brought his own separate proceeding, consistent with state law, seeking to have his license reinstated. *Id.* at 512–13, 514 n. 4. It is this proceeding that the court addressed.

(B)(i) The look-back date specified in this subparagraph is a date that is 36 months (or, in the case of payments from a trust or portions of a trust that are treated as assets disposed of by the individual pursuant to paragraph (3)(A)(iii) or (3)(B)(ii) of subsection (d) of this section or in the case of any other disposal of assets made on or after February 8, 2006, 60 months) before the date specified in clause (ii).

(ii) The date specified in this clause, with respect to-

(I) an institutionalized individual is the first date as of which the individual both is an institutionalized individual and has applied for medical assistance under the State plan, or

(II) a non-institutionalized individual is the date on which the individual applies for medical assistance under the State plan or, if later, the date on which the individual disposes of assets for less than fair market value.

(C)(i) The services described in this subparagraph with respect to an institutionalized individual are the following:

(I) Nursing facility services.

(II) A level of care in any institution equivalent to that of nursing facility services.

(III) Home or community-based services furnished under a waiver granted under subsection (c) or (d) of section 1396n of this title.

(ii) The services described in this subparagraph with respect to a non-institutionalized individual are services (not including any services described in clause (i)) that are described in paragraph (7), (22), or (24) of section 1396d(a) of this title, and, at the option of a State, other long-term care services for which medical assistance is otherwise available under the State plan to individuals requiring long-term care.

(D)(i) In the case of a transfer of asset made before February 8, 2006, the date specified in this subparagraph is the first day of the first month during or after which assets have been transferred for less than fair market value and which does not occur in any other periods of ineligibility under this subsection.

(ii) In the case of a transfer of asset made on or after February 8, 2006, the date specified in this subparagraph is the first day of a month during or after which assets have been transferred for less than fair market value, or the date on which the individual is eligible for medical assistance under the State plan and would otherwise be receiving institutional level care described in subparagraph (C) based on an approved application for such care but for the application of the penalty period, whichever is later, and which does not occur during any other period of ineligibility under this subsection.

(E)(i) With respect to an institutionalized individual, the number of months of ineligibility under this subparagraph for an individual shall be equal to—

(I) the total, cumulative uncompensated value of all assets transferred by the individual (or individual's spouse) on or after the look-back date specified in subparagraph (B)(i), divided by

(II) the average monthly cost to a private patient of nursing facility services in the State (or, at the option of the State, in the community in which the individual is institutionalized) at the time of application.

(ii) With respect to a non-institutionalized individual, the number of months of ineligibility under this subparagraph for an individual shall not be greater than a number equal to—

(I) the total, cumulative uncompensated value of all assets transferred by the individual (or individual's spouse) on or after

the look-back date specified in subparagraph (B)(i), divided by

(II) the average monthly cost to a private patient of nursing facility services in the State (or, at the option of the State, in the community in which the individual is institutionalized) at the time of application.

(iii) The number of months of ineligibility otherwise determined under clause (i) or (ii) with respect to the disposal of an asset shall be reduced-

(I) in the case of periods of ineligibility determined under clause (i), by the number of months of ineligibility applicable to the individual under clause (ii) as a result of such disposal, and

(II) in the case of periods of ineligibility determined under clause (ii), by the number of months of ineligibility applicable to the individual under clause (i) as a result of such disposal.

(iv) A State shall not round down, or otherwise disregard any fractional period of ineligibility determined under clause (i) or (ii) with respect to the disposal of assets.

(F) For purposes of this paragraph, the purchase of an annuity shall be treated as the disposal of an asset for less than fair market value unless-

(i) the State is named as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the institutionalized individual under this subchapter; or

(ii) the State is named as such a beneficiary in the second position after the community spouse or minor or disabled child and is named in the first position if such spouse or a representative of such child disposes of any such remainder for less than fair market value.

(G) For purposes of this paragraph with respect to a transfer of assets, the term "assets" includes an annuity purchased by or on behalf of an annuitant who has applied for medical assistance with respect to nursing facility services or other long-term care services under this subchapter unless—

(i) the annuity is—

(I) an annuity described in subsection (b) or (q) of section 408 of Title 26; or

(II) purchased with proceeds from—

(aa) an account or trust described in subsection (a), (c), or (p) of section 408 of such title;

(bb) a simplified employee pension (within the meaning of section 408(k) of such title); or

(cc) a Roth IRA described in section 408A of such title; or

(ii) the annuity—

(I) is irrevocable and non-assignable;

(II) is actuarially sound (as determined in accordance with actuarial publications of the Office of the Chief Actuary of the Social Security Administration); and

(III) provides for payments in equal amounts during the term of the annuity, with no deferral and no balloon payments made.

(H) Notwithstanding the preceding provisions of this paragraph, in the case of an individual (or individual's spouse) who makes multiple fractional transfers of assets in more than 1 month for less than fair market value on or after the applicable look-back date specified in subparagraph (b), a State may determine the period of ineligibility applicable to such individual under this paragraph by—

(i) treating the total, cumulative uncompensated value of all assets transferred by the individual (or individual's spouse) during all months on or after the look-back date specified in subparagraph (B) as 1 transfer for purposes of clause (i) or (ii) (as

the case may be) of subparagraph (E); and

(ii) beginning such period on the earliest date which would apply under subparagraph (D) to any of such transfers.

(I) For purposes of this paragraph with respect to a transfer of assets, the term "assets" includes funds used to purchase a promissory note, loan, or mortgage unless such note, loan, or mortgage-

(i) has a repayment term that is actuarially sound (as determined in accordance with actuarial publications of the Office of the Chief Actuary of the Social Security Administration);

(ii) provides for payments to be made in equal amounts during the term of the loan, with no deferral and no balloon payments made; and

(iii) prohibits the cancellation of the balance upon the death of the lender.

In the case of a promissory note, loan, or mortgage that does not satisfy the requirements of clauses (i) through (iii), the value of such note, loan, or mortgage shall be the outstanding balance due as of the date of the individual's application for medical assistance for services described in subparagraph (C).

(J) For purposes of this paragraph with respect to a transfer of assets, the term "assets" includes the purchase of a life estate interest in another individual's home unless the purchaser resides in the home for a period of at least 1 year after the date of the purchase.

### Order

This matter having been opened to the Court upon motion of Zoe Jeanne McLaughlin, Esq., counsel for Defendants Jennifer Velez, Commissioner of the New Jersey Department of Human Services, et al., to dismiss Plaintiffs' Complaint; it appearing that the parties' moving and opposition briefs were considered pursuant to Fed. R. Civ. P. 78; and for the reasons stated in the Opinion of this date and good cause shown:

It is on this 30th day of March, 2010,

ORDERED that Defendant's motion to dismiss is DENIED.